OPINION OF THE COURT
Martha K. Zelman, J.
The present case involves the difficult question of housing for the homeless, and one community’s partial opposition thereto.
BACKGROUND
Springfield Gardens is a fine residential community com *691 posed basically of one-family homes. Into this community, a nonprofit corporation, Homes for the Homeless, Inc., wants to thrust approximately 715 homeless people.
Springfield Gardens, a community of approximately 3,000 people, is represented in this action by Spring-Gar Community Civic Association, Inc., an association formed in 1968, and by J. Clifford Gadsden, individually and as chairman of the Spring-Gar Community Civic Association. It has approximately 500 members who are homeowners in the Springfield Gardens community, a community bounded by South Conduit Avenue on the north, Rockaway Boulevard on the southwest, and Springfield Boulevard on the southeast. One of the stated purposes of the association is "to protect and promote the best interests of the residents of the area”. It is for this purpose that the association and its chairman, J. Clifford Gadsden, both as Chairman and individually as a homeowner in the Springfield Gardens area, bring suit to permanently enjoin Homes for the Homeless from depositing what has to be considered a very substantial number of homeless people into this area. The community believes that the large number of homeless people will seriously and adversely affect the existing patterns of population growth, distribution and concentration, and the character of the community and the neighborhood. Accordingly, they fear the value of their homes will be reduced.
The Springfield Gardens community at the present time does not have an overabundance of hospital facilities, educational facilities, or police protection. The sudden addition of a substantial number of people, be they homeless or otherwise, would seem to pose a potential for strain on a multitude of services in the community, including those already mentioned. It is for these reasons, among others, that the plaintiffs oppose the sudden dumping of 715 people into the community.
The object of the community’s opposition in this action is defendant Homes for the Homeless, a nonprofit corporation, which corporation is an interfaith project of the Cathedral of St. John the Divine in New York City. Recognizing that there is a problem in New York City when it comes to providing shelter for the homeless, Homes for the Homeless’ stated purpose is to help fill a need for more private sector involvement in the problems of the homeless. Their program is designed to provide temporary housing for homeless families, together with counseling, job training, and other social services programs, and to assist such families in obtaining per *692 manent housing. The stated objective of this homeless project is to make homeless families as independent as possible and to reestablish them in the community through assistance in locating permanent residencies and jobs.
Homes for the Homeless has leased a building in Springfield Gardens and has named the property the Saratoga Inter-Faith Inn. The property, formerly known as the Holiday Inn, is located on Rockaway Boulevard, Queens County. It is bounded on three sides by commercial buildings, and on the fourth, across Rockaway Boulevard, by Kennedy Airport. The closest homeowners in Springfield Gardens are approximately two blocks away. Mr. Gadsen’s home is approximately one-half mile away. The Saratoga has 259 residential units.
Homes for the Homeless plans on using the facility to provide housing solely for family units, approximately 200 such units, one family to a room. Families of two, three, or four will occupy one room for that family. It is anticipated that there will be no more than 450 children, of which approximately 200 will be teen-agers. Under its operational plan, there will be a comprehensive range of programs and social services. Such programs include child care assistance, job training, family counseling, and help in locating housing. As now planned, there is to be a staff of 141, including internal security. The facility is considered by the Human Resources Administration of the City of New York as a Tier II facility, with communal dining areas and sanitary facilities.
Homes for the Homeless has never operated a facility of this magnitude. In fact, they have only operated one other facility in The Bronx, which facility is limited to 70 families.
Under recent court decisions, the City of New York is obligated to provide housing for the homeless. To meet this need the Human Resources Administration of the city itself operates some emergency housing, but the majority of the apparently 4,700 families per night it aids are placed in privately run facilities, like the Saratoga. Funding is provided by the Human Resources Administration to the Saratoga for its housing of homeless facilities with aid to dependent children funds. These funds represent 50% from the Federal Government, 25% from the State, and 25% from city funds. In addition, the Human Resources Administration, in part, supervises the operation of the Saratoga. Accordingly, the City of New York and various officers of city agencies are named as defendants.
*693 The people of Springfield Gardens do not oppose homeless people. The people of Springfield Gardens do not even oppose having homeless people being introduced into their community, a community that already has accepted other types of smaller shelters. What the people of Springfield Gardens do oppose is the sudden introduction of very large numbers of people, viz., approximately 715, into this community of approximately 3,000. This court can understand and definitely sympathizes with the people of Springfield Gardens.
THE LAW
The plaintiffs’ complaint sets forth three causes of action. Count I alleges a public and private nuisance. Count II claims environmental violations under the SEQRA and CEQA laws. Count III states that the local community was not notified as required by the Social Services Law.
Though sympathizing with the plaintiffs, this court finds itself constrained to follow the law, and, accordingly, the plaintiffs’ complaint for a permanent injunction must be dismissed.
COUNT I — THE NUISANCE CLAIMS
Plaintiffs, in their complaint, alleged that the use of the Saratoga Inn by defendant Homes for the Homeless as a residence for very large numbers of homeless individuals will constitute a menace to the public health, safety, moral and general welfare and well-being of the residents of Springfield Gardens and to the homeless people who would reside at this facility, thereby creating a public and private nuisance. Plaintiffs further allege that they will sustain irreparable damages in that the operation and maintenance of a residential shelter for the homeless will greatly inconvenience and restrict plaintiffs’ use and enjoyment of their property and that the value of their property will depreciate. These allegations do not support a cause of action for either a public or private nuisance.
The maintenance and operation of a residential facility for homeless families is not a nuisance per se. Rather, facilities such as the Saratoga Inn have become public necessities, which are lawful in character and in the public interest. (See, Social Services Law § 41; 18 NYCRR part 900; see also, Matter of Tafnet Realty Corp. v City of New York, 118 Misc 2d 498.) Homeless families with children are entitled to emergency *694 shelter on both constitutional and statutory grounds, and the courts lack the power to condition or limit the number of homeless persons a facility can accommodate. (See, McCain v Koch, 117 AD2d 198, mot to vacate stay denied as unnecessary 68 NY2d 713; cf., Matter of Lamboy v Gross, 129 Misc 2d 564, affd 126 AD2d 265 [1st Dept 1987].) The court, therefore, may not enjoin the maintenance and operation of the Saratoga Inn based upon plaintiffs’ uncertain apprehensions, conjectural injuries, and mere speculation that a facility of this kind will be maintained in such a manner as to constitute a nuisance. (See, 42 NY Jur, Nuisance, § 54.)
A public nuisance "is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency * * * It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons” (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568 [1977]).
Thus, such nuisance would exist if there is a substantial interference with the common rights of the public at large. Such activity would violate a public law or rule and for this reason would be considered to be a public nuisance. The plaintiffs have been unable to offer evidence that shows that the Saratoga Inn creates a public nuisance. The reason for that is probably because the Saratoga Inn has not opened its doors for a substantial period of time so that we can evaluate its impact on the community. One major argument advanced by the plaintiffs was that the value of the property in the community will decrease. An expert testified that in his opinion, because of the oversaturation of people in the area, there could be a possible increase in crime and this would cause the value of real estate to fall.
When a public nuisance is found, such invasion of public rights is to be left to be remedied by public officials. (Burns Jackson Miller Summit & Spitzer v Lindner, 59 NY2d 314 [1983].) However, unfortunately for a private party to sue for a public nuisance, the private party must show that that party has suffered some "special damage” from the alleged public nuisance, separate and apart from any injury suffered by the public generally. Otherwise, the party does not have standing to sue. (Burns Jackson Miller Summit & Spitzer v *695 Lindner, supra; Wakeman v Wilbur, 147 NY 657 [1895]; Queens County Business Alliance v New York Racing Assn., 98 AD2d 743 [1983]; Copart Indus. v Consolidated Edison Co., supra.)
Assuming, arguendo, that plaintiffs have established a public nuisance claim, which they have not, the next question to consider is whether they have standing to bring this cause of action, i.e., whether they have suffered special damages. The leading case in this area is Burns Jackson (supra). In Burns Jackson, two New York law firms brought suit on behalf of all professional and business entities in New York City against the Transport Workers Union and union officials as a result of their illegal transit strike in 1980. The action sought loss of business profits for these businesses that rely upon public transportation serving the city and have been damaged. Their claim was predicated, among other claims, on a private cause of action for a public nuisance, the transit strike. The Court of Appeals denied their claim, stating the following (at 334-335): "When the injury claimed to be peculiar is of the same kind suffered by all who are affected, when it 'is common to the entire community’ (Francis v Schoellkopf, 53 NY 152, 154), or, as Prosser put it (52 Va L Rev, p 1015), 'it becomes so general and widespread as to affect a whole community,’ the injury is not peculiar and the action cannot be maintained * * * The economic loss which results from a transit strike is not recoverable in a private action for public nuisance because the class includes all members of the public who are affected by the strike”.
In the case at bar, the plaintiffs have not shown how they would be damaged in a way that is different from the rest of the community. Therefore, the same result reached in Burns Jackson (supra) must be reached here.
A private nuisance is one that substantially threatens an interference with the use or enjoyment of land. This interference may be as a result of an intentional act, a negligent act, or as a result of an act based on absolute liability. Such nuisance is one that threatens one person or relatively few persons. Once this invasion or interference occurs, the private nuisance gives rise to a course of action against the person or persons whose action or lack of action causes the invasion or interference. (See, Copart Indus. v Consolidated Edison Co., supra.)
In the case at bar, the plaintiffs have not established during *696 the trial of this action that the land possessed by any individual, or few individuals, in the community was harmed by the establishment or operation of the Saratoga. Realizing that the Saratoga only opened on February 27, 1987, and that as of April 24, 1987 only 125 families were in the Saratoga, would permit the court to use its equity powers if it was shown that it was highly probable that the activity would lead to a private nuisance. (Hamilton Corp. v Julian, 130 Md 597, 101 A 558 [1917].)
COUNT II — THE ENVIRONMENTAL CLAIMS
Plaintiffs, in their second cause of action, base their request for injunctive relief upon the assertion that defendants’ policy and decisions to use the Saratoga Inn as a facility for a large number of homeless families, and to provide funding to this facility are actions which may have a significant affect on the environment, so that under the provisions of SEQRA, and the regulations promulgated thereunder (6 NYCRR part 617) and City Environmental Quality Review (CEQR), the actions should have been preceded by an environmental impact statement. (See, ECL 8-0105, 8-0109.) The city defendants assert that SEQRA and CEQR are inapplicable as there has been no governmental action in connection with the establishment and operation of the Saratoga Inn, as defined by ECL 8-0Í05 (4) (i), (ii) and 6 NYCRR 617.2 (b). The city claims that the Human Resource’s Administration’s referral of homeless families to the Saratoga Inn, and the use of Aid to Dependent Children shelter funds to reimburse the Saratoga Inn for a family’s stay do not constitute "planning activity” or "funding” under the environmental statutes and regulations. It is further asserted that even if the referral of homeless families to a particular private shelter were deemed a "policy” and therefore an "action” under SEQRA, defendants would not be required to fill an environmental impact statement, as such an action constitutes "Type II” activity, under 6 NYCRR 617.13, and therefore has no significant effect on the environment. Finally, it is asserted that even if an "action” exists which is not exempt under Type II actions, injunctive relief pending SEQRA review should not be granted, under the emergency exemptions of CEQR 4 (h) and 6 NYCRR 617.2 (o) (6), although there has been no actual declaration of an emergency by the city agencies.
It is undisputed that SEQRA and CEQR applies only to *697 government actions and decision-making and that purely private activity is not subject to environmental review. (See, ECL 8-0105.) Plaintiffs therefore cannot seek injunctive relief against Homes for The Homeless, a private corporation on the basis of alleged SEQRA and CEQR violations.
The initial determination to be made under SEQRA and CEQR is whether an environmental impact statement is required, which in turn depends on whether an action may or will have a significant effect on the environment. (ECL 8-0109 [2]; CEQR 7 [a].) It is clear from the express terms of the statutes and regulations that the term environment is broadly defined and includes "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character”. (ECL 8-0105 [6]; CEQR 1 [f]; 6 NYCRR 617.2 [k]; see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400.)
Turning now to the city defendants, the court finds unpersuasive their assertion that their activities in connection with the operation and use of the Saratoga Inn as a facility for homeless families does not constitute an "action”. It is clear that the Human Resources Administration and the Department of Social Services, in providing assistance to needy families, actively houses homeless families in the Saratoga Inn and other facilities and are not mere referral agencies. Rather, it is the policy of the city to house homeless families in facilities such as the Saratoga Inn, and therefore this policy constitutes an action within the meaning of SEQRA (ECL 8-0105 [4]; see, Midtown S. Preservation v City of New York, NYLJ, Jan. 5, 1987, at 6, col 5; see also, McCain v Koch, 117 AD2d 198, supra; Slade v Koch, 135 Misc 2d 283). The court further finds that the change in the use of Saratoga Inn from a transient hotel (the former Holiday Inn) to a facility for homeless families may have a check on the existing population patterns and neighborhood patterns, so as to require the city at the very least to make a threshold determination as to the environmental impact of its actions under SEQRA and CEQR. (Cf., Chinese Staff & Workers Assn. v City of New York, supra; Matter of Jackson v New York Urban Dev. Corp., supra; Midtown S. Preservation v City of New York, supra.) The city defendants are therefore required to follow the environmental review procedures mandated by SEQRA and CEQR.
In view of the fact that the city has yet to make such a threshold determination, the court makes no determination as *698 to whether the city’s actions fall within Type II actions, and therefore are exempt. (See, 6 NYCRR 617.13.) Furthermore, as no environmental procedures have been undertaken it is premature for the court, at this time, to consider whether the social and economic impact factors have been properly identified, assessed and applied.
Plaintiffs’ request for an injunction until such time as defendants have conducted a complete review of the environmental impact of its actions however is denied. Defendants assert that even if they are required to follow the SEQRA and CEQR procedures an emergency exists with respect to the use of the Saratoga Inn because the protection and preservation of the life and health of homeless families and children require immediate action which cannot await the usual procedures set forth in CEQR (6 NYCRR part 617). Although there has been no declaration of emergency as regards the use of the Sara-toga Inn, it is beyond dispute that the plight of the homeless in New York City is so life threatening and of such proportions as to come within the meaning of the applicable emergency provisions of CEQR 4 (h) and 6 NYCRR 617.2 (o) (6), so as to provide some dispensation from the requirements generally governing environmental standards. (Matter of Gerges v Koch, 62 NY2d 84; Matter of Board of Visitors — Marcy Psychiatric Center v Coughlin, 60 NY2d 14; Vann v Koch, NYLJ, Feb. 20, 1987, at 16, col 4; Greenpoint Renaissance Enter. Corp. v City of New York, Sup Ct, Kings County, Feb. 24, 1987, Hutcherson, J.)
The court recognizes the valid concerns and fears of the community that the establishment of this facility may bring serious ecological, sociological and economic problems affecting the quality of life for the residents of Springfield Gardens. However, on a motion for injunctive relief the court is required to consider and balance the equities of the parties and where, as here, to deny access to homeless families to the Saratoga Inn would present a far more serious harm than that which could result to the community, a balancing of the equities favors the homeless. (See, Vann v Koch, supra; Green-point Renaissance Enter. Corp. v City of New York, supra.)
COUNT III — THE NOTICE CLAIM
Plaintiffs’ third cause of action, which alleges that the defendants failed to provide plaintiffs with ample notice and information as to the projection of the Saratoga Inn, as a *699 facility for homeless families, pursuant to section 43 (11) of the Social Services Law and 18 NYCRR 800.4 has merit. The testimony was that Sister Joan Kirby and Emmanuel Stern were listed as speakers at a meeting of Community Board No. 13 on June 23, 1986. The testimony of the chairwoman was that their appearance was listed as an item and that neither speaker could answer amply questions that were put to them. There is no question in the court’s mind that there should have been more involvement with the community. It was up to the parties to hold community-wide public hearings instead of "dumping” such a large project on the community. It is up to the legislative and executive branches of the government to present to the community all the information they can before going ahead and disregarding their needs.
Though this court is constrained to decide the case as it did, the court does so with a heavy heart. The court does not believe that overburdening a community, as will be done here, is just. Accordingly, it asks the Legislature to address the issue. At the very least, the Legislature should promulgate laws that will provide the community with the right to a hearing on any proposed homeless shelter, rather than mere notice of intent to act, when such action is planned. The Legislature should also establish laws that would prevent large numbers of homeless from being placed into any one particular area. In fact, a City Council Committee, the Select Committee on the Homeless, has recommended to the Mayor of the City of New York that no shelter should contain more than 100 families. Such recommendation should be enacted into law. It is for the Legislature, not for the courts, to so act.
Lastly, this court is concerned not only about the people of Springfield Gardens, but also the homeless as well. This court is not unmindful that the housing being provided to the homeless at the Saratoga, though far from the least desirable, is also far from ideal. It is concerned that families are being placed into a room for the homeless which is immediately surrounded on three sides by commercial and industrial plants including freight forwarders and cargo terminals, with trucks going in, out, and around, all the time. On the fourth side lies Rockaway Boulevard, a major roadway that is now considered part of the Nassau-Queens Expressway. This court views this location as being highly dangerous for its residents who desire to leave the premises by foot. Further, the fact that families must share one room, including children sleeping with their parents, and children of the opposite sex *700 sleeping together, is certainly not healthy, and cries out for relief. Moreover, the fact that the housing is merely transitory does not insure continuity and stability in the education of children.
The Comptroller of the City of New York, the Honorable Harrison J. Goldin, in a report dated April 23, 1987 entitled, Room to Spare But Nowhere to Go, set forth a better solution of this problem wherein he stated: "The City owns approximately 3700 occupied buildings which it seized for nonpayment of taxes; they contain about 4000 vacant apartments. We inspected 445 of these apartments in 85 different occupied rem buildings; it would cost under 9 million dollars to rehabilitate them all”. This would give permanent housing to the homeless, it would stop shunting families and children from one inhumane shelter to another. These people by temporary housing are denied stable environments. Temporary housing fragments social and educational needs. The city needs an intensive city-wide rehabilitation program to meet the problem on a permanent basis. In the long run, this would save more money by addressing the problem head on.
Accordingly, plaintiffs’ request for a permanent injunction is denied without prejudice to renewing its application should there come a time when special damages can be proven, and defendants’ cross motion to dismiss the complaint is granted.
The city is directed to initiate an environmental proceeding under SEQRA and CEQA consistent with this decision.