■ In the Matter of GREENPOINT RENAISSANCE ENTERPRISE CORPORATION et al., Respondents, v CITY OF NEW YORK et al., Appellants.—In a proceeding pursuant to CPLR article 78, inter alia, to review a determination of the City of New York to increase the number of buildings used as a shelter for homeless men at the Greenpoint Hospital site, the appeal, as limited by the appellants' notice of appeal and brief, is from stated portions of a judgment of the Supreme Court, Kings County (Hutcherson, J.), dated February 24, 1987, which, inter alia, granted those branches of the petition which were for a judgment directing the appellants to comply with the Uniform Land Use Review Procedure (hereinafter ULURP; see, New York City Charter § 197-c) and to file an environmental impact statement (hereinafter EIS) and enjoining the appellants from using or altering the West Building at the Greenpoint Hospital site until the applicable regulatory provisions have been complied with.

Ordered that the judgment is modified, (1) by deleting the provision thereof which found that the use of the North, East and West Buildings of the Greenpoint Hospital site would have a significant impact on the environment and that an EIS is necessary; (2) deleting the provision thereof which held that the West Building is not subject to the emergency as declared by the Human Resources Administration; and (3) vacating the injunction enjoining the appellants from utilizing or altering the West Building until the applicable regulatory laws have been complied with; as so modified, the judgment is affirmed insofar as appealed from, without costs or disbursements.

This is yet another in a long line of cases in which the courts have been asked to decide whether the City of New York has sufficiently complied with the relevant environmen-

tal regulations and land use procedures while carrying out its obligation to shelter the homeless pursuant to a consent judgment *(Callahan v Carey,* Sup Ct, NY County, Aug. 1981).

To meet the more than 300% increase since 1981 in the population of homeless men (the group relevant to this appeal), the city has constructed new facilities, upgraded a variety of existing buildings and converted various city buildings into shelters. The city, at the time this proceeding was commenced, operated 14 shelters for homeless men, in addition to paying for shelter at six commercial lodging houses in the Bowery. The city also operated eight shelters for homeless women and provided and arranged and paid for shelter for about 4,600 homeless families each night.

The city is confronted with many obstacles in meeting its obligations to homeless people, including the loss of certain facilities because of the State's demand for the return of some of its buildings and because of community opposition. Over the past few years, there have been numerous proceedings brought by community groups and others concerning several different shelter sites, including the subject Greenpoint site.

The Greenpoint Hospital site is located in the Williamsburgh-Greenpoint section of Brooklyn. The five-acre, eight-building site, which is owned by the city, had been leased to the New York City Health and Hospitals Corporation, but was returned to the city in or about 1982, when the hospital closed. In or about August 1983, the city assigned control of the main building to the Human Resources Administration, which began using that building (hereinafter Greenpoint I) as a shelter for approximately 300 men. Greenpoint I has been continuously used since then and its present capacity is about 400 men. A second vacant building (hereinafter Greenpoint II) was opened in November 1985 to shelter approximately 160 men. In March 1986 a third building (hereinafter Greenpoint III) was opened, housing approximately 90 men. After the homeless male population in the city increased from approximately 1,000 to about 8,900 in less than three months, the city was required to renovate three more of the Greenpoint Hospital buildings (the North, East and West Buildings) to house an additional 300 men.

In 1984 after the opening of Greenpoint I, but prior to the opening of any of the other buildings the petitioners and other community residents formed the Greenpoint Renaissance Enterprise Corporation (hereinafter GREC), in response to what they described as the city's inadequate efforts to provide only

temporary bedspace to the homeless. In August 1984 GREC submitted to the city a "comprehensive proposal" for the use of the Greenpoint Hospital site which included a Federally subsidized senior citizen's housing project, a transitional shelter for homeless men, an intergenerational housing project for homeless single women with children and homeless older women, a skilled nursing facility and a comprehensive health center. According to Stanley Brezenoff, the Deputy Mayor who had a number of meetings with GREC, he advised the petitioners that the city was willing to relocate the men from the Greenpoint site, but only if petitioner found alternative sites within the community. No alternative sites, however, were ever proposed by GREC. Nevertheless, when GREC advised the city that it had in October 1986 secured Federal funding for the senior citizen's center, the city agreed to relocate 160 men in Greenpoint II and permit GREC to use that building for the center.

In November 1986 Mr. Brezenoff advised GREC of the city's determination to renovate the then vacant North, East and West Buildings to shelter up to 300 additional homeless men. Soon thereafter the city opened the North Building to shelter about 93 men and on January 16, 1987, the Human Resources Administrator declared an emergency with respect to the North, East and West Buildings. He determined that "the protection and preservation of the life and health of homeless people require immediate action which cannot await the usual procedures set forth in [City Environmental Quality Review (Executive Order No. 91) hereinafter] CEQR [and] without the addition of the [three vacant buildings], we run an acute risk of being unable to provide shelter for the homeless as required by law".

Prior to the declaration of the emergency, however, the petitioners had already commenced the instant proceeding on January 13, 1987. The petitioners alleged that the "policy and decision" to add 300 additional men at the Greenpoint site was an "action" within the meaning of State Environmental Quality Review Act (hereinafter SEQRA; ECL art 8) and the CEQR and that the city violated those laws by failing to prepare an EIS. They also asserted that the city violated the ULURP procedures by failing to conduct the requisite public hearings. As relief they sought, *inter alia,* an injunction against the city prohibiting it from altering, improving or making capital expenditures on any building at the Greenpoint Hospital site, except for Greenpoint I, II and III. Simul-

taneously, with the filing of their petition, the petitioners moved for a preliminary injunction.

In response to the petition and in opposition to the motion, the city described its shelter program and the dramatic rise in the homeless population, and argued that while in good faith it believed that the renovation of the three vacant Greenpoint buildings was exempt from environmental laws, it nonetheless intended to fully comply with CEQR and SEQRA. The city also argued that ULURP is not applicable to the renovation of city-owned buildings.

On February 24, 1987, the Supreme Court, Kings County (Hutcherson, J.), granted the petition to the extent of directing the city to comply with SEQRA, CEQR and ULURP and to file an EIS. The court also enjoined the city from utilizing and/or altering the West Building as a shelter pending compliance with SEQRA, CEQR and ULURP.

On or about March 4, 1987, the city filed a notice of appeal which stayed the Supreme Court's order pursuant to CPLR 5519 (a). The petitioners moved to vacate the city's statutory stay, but this court denied that motion on March 18, 1987. Thereafter, the East and West Buildings were opened and are currently being utilized.

The appellants essentially concede that they must follow the environmental review procedures mandated by SEQRA and CEQR and have commenced such procedures. They complain, however, that the court exceeded its jurisdiction when it found that the use of the three additional Greenpoint buildings would have a significant impact upon the environment and that an EIS was required. We agree.

The Court of Appeals has made it quite clear that it is not the role of the courts to determine whether an action will have a significant impact on the environment, thereby triggering the requirement for an EIS *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359). The courts instead must limit their review to whether the appropriate agencies identified the relevant areas of concern, took a "hard look" at them and made a "reasoned elaboration" of the basis of their determination; the courts' role is a supervisory one *(Aldrich v Pattison,* 107 AD2d 258, 265).

Therefore, it is clear that the court exceeded its jurisdiction by making the administrative decision that the opening of the additional Greenpoint buildings would have a significant impact on the environment. That decision is for the relevant city agencies to make. The Department of Environmental Protec-

tion and the Department of City Planning are apparently now conducting that environmental assessment, but have not yet issued a determination. Thus, until that determination has been made there can be no legal challenge.

We also agree that the petitioners were not entitled to injunctive relief with respect to the West Building at the Greenpoint site. 6 NYCRR 617.2 (q) (4), implementing SEQRA, and section 4 (h) of CEQR are identical in exempting from the environmental laws "actions which are immediately necessary on a limited emergency basis for the protection * * * of life, health, property or natural resources". That exception permits an agency to commence work or take action on a project prior to the completion of the environmental review procedures (see, Matter of Board of Visitors—Marcy Psychiatric Center v Coughlin, 60 NY2d 14). Moreover, as the court in Marcy noted, once an agency determines that an emergency exemption exists, the standard of review is not whether the court would conclude that an emergency exists; it is rather whether the determination by the agency that such an emergency exists is arbitrary and capricious.

Given the nature of the homeless situation, the city could reasonably conclude (as it did) that the Greenpoint Hospital project represents emergency action within the applicable regulations sufficient to allow it to continue with the project pending the completion of environmental review procedures. Moreover, the city could reasonably conclude that an emergency existed not only with respect to the North and East Buildings (as the court concluded) but with respect to the West Building as well. Thus the court's finding of no emergency with respect to the West Building was incorrect.

Moreover, although there are no exceptional provisions for emergency situations found in ULURP comparable to those in CEQR and SEQRA and although, contrary to the appellants' contention, ULURP does apply here (see, Matter of Gerges v Koch, 62 NY2d 84; Vann v Koch, NYLJ, Feb. 20, 1987, at 16, col 4), the petitioners may participate in ULURP review while the appellants continue to utilize the premises (see, Matter of Gerges v Koch, supra; Vann v Koch, supra). The city should proceed with the ULURP review expeditiously.

Accordingly, the injunction previously granted by the Supreme Court, Kings County, should be vacated. Lawrence J. P., Kunzeman, Kooper and Spatt, JJ., concur.