OPINION OF THE COURT
Helen E. Freedman, J.
This motion by defendants the City of New York, the Human Resources Administration of the City of New York (HRA), the New York City Department of Environmental Protection, the New York City Department of Buildings, and Elizabeth Holtzman, as Comptroller of the City of New York (collectively, the City defendants), and Homes for the Homeless (HFH) for summary judgment on the grounds that the complaint fails to state a cause of action and that plaintiffs’ claims are time barred is granted, and plaintiffs’ cross motion for summary judgment declaring that defendants failed to comply with the Uniform Land Use Review Procedure (ULURP), the State Environmental Quality Review Act (SEQRA), the City Environmental Quality Review (CEQR) and the Criteria for the Location of City Facilities (the Fair Share Criteria or Fair Share) is denied, for the reasons set forth below.
This case arises from the financing, acquisition, and development of a building located at 521 West 49th Street, New York, New York (the Premises). HFH, a not-for-profit corporation which provides shelter for homeless families, acquired the Premises from defendant Bluestone Equities, Inc. The acquisition was financed by an $8.5 million loan made pursuant to article 11 of the New York State Private Housing Finance Law to HFH by the New York City Department of Housing *187 Preservation and Development, which is secured by a mortgage on the Premises.
The Premises had been run as a private residence for college students. After purchase, HFH converted the Premises into a "Tier II” transitional residence for 84 homeless families (primarily single women with one or two young children) called the Midtown Interfaith Family Inn (MIFI). The conversion involved minimal cosmetic renovation and no structural changes to the Premises. HRA refers homeless families to the shelter and reimburses HFH for sheltering them in an amount sufficient to fund MIFI’s capital costs over time, as well as the cost of ongoing operations and social services provided, among other reasons, to assist the families in obtaining permanent housing. Such payments are made from the clients’ public assistance shelter allowances. MIFI is staffed by HFH employees.
On October 8, 1991, after defendants had concluded their negotiations with respect to the acquisition and entered into contracts, but before the closing, HRA Commissioner Barbara J. Sabol sent a letter (the Fair Share Letter) to Mayor Dinkins (with a copy to, among others, plaintiff Manhattan Community Board No. 4), purportedly in accordance with article 9-1 of the Fair Share Criteria (62 RCNY Appendix A) to demonstrate HRA’s compliance with them. The Fair Share Letter stated that "[n]either the City nor the sponsor was able to consult with the community prior to concluding a contract for the [Premises’] purchase to ensure that the deal could be negotiated on the most favorable terms possible.”
On March 11, 1992, plaintiffs commenced this proceeding by service of an order to show cause seeking injunctive and declaratory relief to, among other things, stop the closing. On March 30, 1992, this court denied plaintiffs’ application for a preliminary injunction. Thereafter the transaction was consummated; the City defendants have never taken any measures pursuant to ULURP or issued any environmental impact statement pursuant to SEQRA and CEQR.
Statute of Limitations
Movants first contend that plaintiffs’ claims that ULURP, SEQRA, CEQR and the Fair Shares Criteria were violated are time barred under CPLR 217, which requires a proceeding against a body or officer to be commenced within four months after respondent’s refusal, upon demand of the petitioner, to *188 perform its duty. Defendants argue that plaintiffs’ claim accrued on October 8, 1991, when HRA issued the Fair Share Letter stating the City’s intent to finance and HFH’s intent to purchase the Premises and establish MIFI, thus rendering this proceeding untimely. Plaintiffs contend that the Statute of Limitations began to run when HFH purchased the building, on the theory that, until that time, defendants’ noncompliance with (allegedly) mandated procedures under ULURP, SEQRA, CEQR and the Fair Share Criteria was not final and irreversible.
Both plaintiffs and defendants misconstrue the Statute of Limitations set forth in CPLR 217. As all parties acknowledge, plaintiffs seek judicial relief in the nature of a writ of mandamus to compel. Accordingly, the period of limitations began to run when defendants refused to take such actions as plaintiffs demanded as necessary for compliance with ULURP, SEQRA and CEQR and the Fair Share Criteria. (See, McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C217:l, at 675.) Possibly this did not occur until defendants answered the application for declaratory and injunctive relief brought on by the order to show cause. The court is unaware of any earlier demands, and a party asserting that a Statute of Limitations is applicable has the burden of proving it. (Brush v Olivo, 81 AD2d 852, 853 [2d Dept 1981].) Having failed to meet that burden, summary judgment cannot be granted to defendants on that basis. Accordingly, the court will consider the underlying claims.
ULURP
Plaintiffs argue that ULURP applies here because HPD’s acquisition financing falls within one of the enumerated categories of actions subject to the law, to wit, "[h]ousing and urban renewal plans and projects pursuant to city, state and federal housing laws.” (NY City Charter § 197-c [a] [8].) Defendants deny that their proposed course of action, i.e., a loan by the City to a private organization for the purchase of a single building, and its conversion after minor cosmetic renovation from one sort of privately owned and operated residence to another, constitutes a "housing or urban renewal plan” of the type subject to the various ULURP review procedures set forth in the City Charter.
Additionally, defendants argue that ULURP does not apply to actions "otherwise provided” for under the City Charter *189 (§ 197-c [a]). Under section 1802 (6) (d) of the Charter and section 572 (14), article 11 of the Private Housing Finance Law, HPD represents the City in implementing Private Housing Finance Law provisions relating to loans to limited project housing companies for providing housing to low-income persons. Accordingly, defendants argue, HPD is neither required nor even permitted to submit proposed article 11 loans to ULURP review.
Although the City Charter does not define a "housing plan”, the conversion of a dormitory to a shelter pursuant to the Private Housing Finance Law does not constitute a "[h]ousing or urban renewal plan” as envisioned by the City Charter. Since Private Housing Finance Law loans of this type are specifically authorized by the City Charter, they are outside the scope of section 197-c. In a case involving the acquisition and renovation of a single room occupancy (SRO) pursuant to a Private Housing Finance Law loan to a not-for-profit organization for use as a transitional residence for homeless families and as housing for homeless elderly persons, ULURP approval was found unnecessary, in that the project was neither a capital project nor an urban renewal plan but a Private Housing Finance Law loan. (Westside Neighborhood Group v City of New York, NYLJ, Jan. 11, 1989, at 22, col 4 [Sup Ct, NY County 1988] [Preminger, J.].)
In support of their claim, plaintiffs cite language from West 97th-W. 98th Sts. Block Assn. v Volunteers of Am. of Greater N. Y. (153 Misc 2d 321, 327 [Sup Ct, NY County 1991] [Schoenfeld, J.]) to the effect that the conversion of a SRO to a shelter is an "agency determination[ ] that one would normally think of as constituting a 'housing plan’ ” under ULURP. In West 97th-W. 98th Sts., a challenge under ULURP to a loan made by the City to finance both the acquisition of a SRO and its gutting and renovation survived a motion to dismiss. However, the same court denied a preliminary injunction application predicated on failure to comply with ULURP and indicated that the Statute of Limitations probably precluded the application of ULURP from any further review. Moreover, the extensive gutting and renovation involved renders West 97th-W. 98th Sts. readily distinguishable from this case.
Other cases cited by plaintiffs are also distinguishable. Matter of Briarwood Community Assn. v City of New York (147 AD2d 639 [2d Dept], lv denied 74 NY2d 601 [1989]) involved new construction of a City-owned facility on City- *190 owned land, not private property. In Matter of Plotnick v City of New York (148 AD2d 721 [2d Dept], lv denied 74 NY2d 601 [1989]), the applicability of a different provision of ULURP, i.e., New York City Charter § 197-c (a) (5), covering site selection for capital projects, was at issue. Finally, Matter of Greenpoint Renaissance Enter. Corp. v City of New York (137 AD2d 597 [2d Dept], lv denied 72 NY2d 810 [1988]) concerned the expansion of a City-owned facility.
Plaintiffs also contend that HRA’s agreement to pay HFH for its services made ULURP applicable to this case. Such agreement, plaintiffs claimed, constituted "[a] contract[ ] * * * respecting the use * * * of real property subject to city regulation” as set forth in the preamble to the City Charter (§ 197-c [a]). This argument is without merit. The language quoted from ULURP’s preamble does not create a category of actions subject to ULURP additional to the 12 enumerated categories. Unless a contract referred to in ULURP’s preamble falls within one of the 12 enumerated categories, the statute is inapplicable. In this case, an agreement under which HRA reimburses HFH for sheltering homeless families is not a contract respecting the use of real property, and therefore, such agreement does not fall within any of ULURP’s enumerated categories.
SEQRA and CEQR
Plaintiffs contend that the City defendants’ failure to issue an Environmental Impact Statement (EIS) with respect to the MIFI project violates SEQRA and CEQR. SEQRA requires agencies to issue an EIS upon taking certain "actions”, which are defined in part as "projects or physical activities * * * that may affect the environment by changing the use, appearance or condition of any natural resource or structure, that * * * involve funding by an agency”. (6 NYCRR 617.2 [b] [1].)
The loan to HFH to purchase MIFI does not constitute an action subject to SEQRA, because the building’s conversion, after minor cosmetic renovations, from a dormitory to a transitory homeless shelter did not affect the neighborhood’s population, water, sewage or other utility systems or the character of its neighborhood.* In view of the lack of significant environmental impact, the defendants’ action is defined *191 as a "Type II” action for which an EIS is not required. (6 NYCRR 617.11, 617.13.) Courts have repeatedly held that a building’s change in use, in and of itself, does not constitute an "action” under SEQRA unless the change has significant environmental impact. (Matter of Town of Yorktown v New York State Dept. of Mental Hygiene, 92 AD2d 897 [2d Dept], affd 59 NY2d 999 [1983] [seminary converted into residential drug facility]; Matter of Schweiss v Ambach, 98 AD2d 148 [3d Dept 1983], affd 63 NY2d 835 [1984] [public school established on same site as drug center]; New York Moratorium on Prison Constr. v New York State Dept. of Correctional Servs., 91 Misc 2d 674 [Sup Ct, Albany County 1977] [school converted into prison]; Westside Neighborhood Group v City of New York, supra.)
For the same reasons, namely lack of environmental impact, CEQR also does not apply to defendants’ actions. They are also "Type II” actions under CEQR, for which an EIS need not be filed. (City Executive Order No. 91 of 1977, as amended, §§ 6-06, 6-15 [b], reprinted in 62 RCNY Appendix A.)
Fair Share Criteria
Plaintiffs’ final contention is that the City defendants violated the Fair Share Criteria by not informing and consulting with the community about the MIFI project until a deal for the acquisition had been consummated. (See, Fair Share Criteria art 4.2.)
The City defendants claim that the Fair Share Criteria merely set forth guidelines for siting facilities, and do not create rights enforceable in a court. Additionally, defendants deny that the Fair Share Criteria are applicable to the City defendants’ actions here, and claim that Commissioner Sabol issued the Fair Share Letter as a voluntary measure.
The Fair Share Criteria are not regulations which dictate procedures for agencies; rather, they are criteria which "are intended to guide the siting of city facilities.” (Fair Share Criteria Preface [emphasis supplied].) The permissive nature of the Fair Share Criteria is evidenced by article 9.1, which provides that statements like the Fair Share Letter shall "describe[ ] the agency’s consideration and application of the relevant sections of the [Criteria], and state[ ] the reasons for any inconsistencies” (emphasis supplied).
Some deviation from the Criteria guidelines, therefore, is anticipated and implicitly allowed. Conceivably a flagrant *192 disregard of the Criteria could give rise to a cause of action, but that is not the situation here: as demonstrated by the Fair Share Letter, the City defendants substantially complied with the Criteria in siting MIFI. For that reason, the City defendants’ failure to notify the plaintiffs earlier does not give rise to a claim.
In any event, the Fair Share Criteria are inapplicable to MIFI. By definition, the Fair Share Criteria apply only to "city facilities.” (Art 3 [a], n 1.) A "city facility” is defined as
"[a] facility providing city services whose location, expansion, closing or reduction in size is subject to control and supervision by a city agency, and which is:
"(i) operated by the city on property owned or leased by the city which is greater than 750 square feet in total floor area; or
"(ii) used primarily for a program or programs operated pursuant to a written agreement on behalf of the city which derives at least 50 percent and at least $50,000 of its annual funding from the city.”
Footnote 2 to article 3 (a) of the Fair Share Criteria states that "[a]s a matter of law, the [Fair Share Criteria] do not apply to siting of facilities by private entities”.
MIFI only partly meets the definition of a "city facility”. It does provide "city services” in a location "subject to control” by the City defendants, in that the facility shelters some of New York’s burgeoning homeless population, and the City defendants unquestionably were involved with the project’s planning and siting. However, MIFI is operated by the staff of HFH, a private organization, in property owned by HFH. Moreover, the programs HFH operates at MIFI, even if construed to be "on behalf of the city”, are not pursuant to any written agreement with the City. Finally, the monies given to HFH, including a market-rate mortgage loan and payments for services rendered — i.e., sheltering homeless families — do not comprise "funding” in the sense of financial assistance to the organization. (See, D&Z Holding Corp. v City of New York, No. 6397/87 [Sup Ct, NY County 1987] [Moskowitz, J.], affd 145 AD2d 1004 [1st Dept 1988] [HRA payments to hotel for sheltering homeless families held not to create enforceable contract].) For that reason, adherence to Fair Share Criteria procedures is not required.
*193 Conclusion
In sum, defendants have demonstrated that ULURP, SEQRA, CEQR, and the Fair Share Criteria do not apply to the MIFI project, and that the Fair Share Criteria have been substantially met. Accordingly, summary judgment is granted to defendants and plaintiffs’ complaint is dismissed.

 It is significant that the Premises’ change in use requires no change in the certificate of occupancy.