*685 OPINION OF THE COURT
Herman Cahn, J.
In this CPLR article 78 proceeding, the court is presented with an issue of first impression: Is the "fair share” analysis requirement provided in the new New York City Charter § 203 retroactive to leases approved by the Board of Estimate under the old New York City Charter when the lease is amended after the new New York City Charter has become effective?
The following facts are undisputed:
A building located at 88 Third Avenue in the Boerum Hill area of Brooklyn, New York, was selected by New York City as the site of a facility for respondent Human Resources Administration of the City of New York (HRA). On September 8, 1988, by resolution, the New York City Board of Estimate, pursuant to then New York City Charter § 67, authorized a lease to be entered into between respondent Department of General Services of the City of New York (DGS), as tenant, and the landlord. At that time, the landlords of the building were respondents Leevic Industries, Inc. and Don Quixote Import, Inc. Now, the landlord is respondent 88 Third Avenue Associates. The 1988 Board resolution stated, in relevant part, that: "[it] hereby authorizes a lease to the City of New York, as tenant, of approximately 73,000 square feet of office space on the first [1st] and second [2nd] floors and 7000 square feet of basement space in the building located at 88 Third Avenue * * * for use by the Human Resources Administration, or for such other similar use as the Commissioner of the Department of General Services may determine” (emphasis added). On November 23, 1988, the lease was executed and specifically stated, under the heading "Use” that the premises "shall be used by [HRA] as office space and, with respect to the Basement Space, as storage, or for such other similar purposes as the Commissioner of General Services may determine”. At the time of the resolution and execution of the lease, HRA planned on using this office space for certain specific HRA programs.
Petitioners and respondents appear to dispute what specific programs were slated to be in this office space. Petitioners allege that the programs were to be the Income Maintenance Clearing Program and a Child Support Enforcement Program. Respondents the City of New York, DGS and HRA contend the programs originally contemplated to be housed in this *686 leased office space were the Bureau of Child Support Enforcement, the Office of Child Support Enforcement and a food stamp office. In any event, the terms of the lease and Board resolution do not specify any particular programs. Subsequently, a dispute arose between the landlord and the City as to the progress of the construction. A compromise was reached whereby respondent DCS would seek mayoral approval for an amendment to the lease (e.g., authorize the City to increase its share of the total cost).
In June 1991, a notice of a June 26, 1991 public hearing to be held pursuant to New York City Charter § 1602 and pertaining to an amendment of the lease was published in the City Record. It is undisputed that the notice indicated that: (1) the amount of the City’s share of the total work would increase from $2,300,000 to $3,300,000; (2) the time after which the City has the right to terminate the lease without penalty would be extended from 2 years to 10 years; (3) the time within which the landlord must commence the required alterations and improvements to the building would extend from 30 days to 60 days after approval; and (4) the premises would be used as HRA office space for the Begin Employment Gain Independence Now-Program and the Child Welfare Administration Program. These programs were different from the ones originally contemplated.
The minutes for the June 26, 1991 public hearing state: "public hearing pursuant to provisions of Section 1602 of the New York City Charter, as submitted by the Department of General Services, Division of Real Property, hereby authorizes an amendment of the lease to the City of New York, as Tenant, of approximately 80,000 rentable square feet of office space in the building located at 88 Third Avenue in the Borough of Brooklyn, for use by the Human Resources Administration’s Begin Employment Gain Independence Now-Program and Child Welfare Administration. Said amendment is necessary in order to: (i) increase the amount of the Tenant’s share of the total work cost from $2,300,000 to $3,000,000, (ii) extend from 2 years to 10 years the time after which the City has the right to terminate this Lease without penalty, and (iii) extend from 30 days to 60 days after approval hereof the time within which Landlord must commence the required alterations and improvements to the building” (emphasis added).
Thereafter, on July 19, 1991, the Mayor of the City of New York approved the amendment to the lease. The mayoral approval did not specifically discuss the HRA programs to be *687 instituted but it did specify the other aforementioned terms (i.e, the increased cost of the work, the termination extension, and the time to commence alterations and improvements).
Further, it is undisputed that pursuant to a lease provision requiring the landlord to obtain all necessary permits to legalize the premises, the landlord, in 1993, sought a special permit from the Board of Standards and Appeals (BSA) to allow the use of the premises as office space. After public hearing on March 16, 1993, BSA granted the special permit allowing the premises to be used as office space.
Construction and renovations of the premises were started and the estimated move-in date by HRA is sometime in July 1994. It is undisputed that while HRA plans on using the premises as office space it has again changed the particular programs to be instituted in this office space. Currently, the HRA programs planned are an Income Support Program, a Medical Assistance Program and a Division of Aids Services.
CPLR ARTICLE 78 PROCEEDING
By order to show cause, petitioners, New York City taxpayers and community residents in the Boerum Hill area of Brooklyn, New York, commenced this action seeking a judgment (1) declaring that the lease was null and void because (a) respondents City of New York, DGS and HRA failed to obtain prior approval, pursuant to New York City Charter §§ 195 and 203, from the New York City Planning Commission (CPC) and New York City Council (Council) of the 1991 amendments to the lease, and (b) respondent DGS failed to give, pursuant to New York City Charter § 1602 (3) (a), proper public notice and hearing of the amendments to the lease concerning proposed uses, (2) mandating that as required under sections 195 and 203, the amendments to the lease must be approved by the CPC and Council, (3) mandating that respondent DGS give proper notice and hearing pursuant to section 1602 (3) (a), and (4) enjoining and restraining respondents City of New York, DGS and HRA from continuing construction and/or renovations on the building or taking any other action to effectuate the lease until such proper approval of the lease is obtained.
Respondents the City of New York, DGS and HRA (collectively municipal respondents), and separately, respondent 88 Third Avenue Associates, cross-move to dismiss this petition as time barred and because the petition fails to state a cause of action upon which relief can be granted.
*688 THRESHOLD ISSUE — STATUTE OF LIMITATIONS
Pursuant to CPLR 217, respondents contend this proceeding was untimely commenced because it was not brought within the applicable four-month statutory period.
CPLR 217 (1) states that: "[u]nless a shorter time is provided in the law authorizing the proceeding, a proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner * * * or after the respondent’s refusal, upon the demand of the petitioner * * * to perform its duty.”
It is well settled that the purpose of CPLR article 78 proceedings is for persons to obtain relief from an aggrievement to them caused by some governmental action (CPLR 7801; Matter of Ahern v Board of Supervisors, 7 AD2d 538, affd 6 NY2d 376). Three types of writ procedures, known as certiorari, mandamus and prohibition, can be used in a CPLR article 78 proceeding. The nature of the proceeding (i.e., the writs) is important when determining the proper measurement of section 217’s four-month limitation period (Matter of De Milio v Borghard, 55 NY2d 216).
Generally, certiorari is the writ used to review judicial or quasi-judicial determinations. The important factor in this writ is that the aggrievement arises from a final determination. The Statute of Limitations for this certiorari writ to review runs from the date the administrative determination becomes final and binding on the petitioner (CPLR 217; Matter of De Milio v Borghard, 55 NY2d 216, supra). The writ of mandamus compels the performance of administrative acts as required by law (Matter of Bernstein v Industrial Commr. of State of N. Y., 57 AD2d 767, on rearg 59 AD2d 678; Matter of Van Patten v Ingraham, 51 Misc 2d 244). In the writ of mandamus, the aggrievement arises from the refusal of a body or officer to act or to perform a duty enjoined by law (Matter of Bernstein v Industrial Commr. of State of N. Y., 57 AD2d 767, supra). The Statute of Limitations for this writ runs from the date the respondent refuses to perform on demand (CPLR 217).
Regardless of the form petitioners choose to couch their proceedings in, the court, not the parties, will determine the nature of the proceeding (see generally, Matter of Save the Pine Bush v City of Albany, 70 NY2d 193). Here, respondents contend the proceeding is one seeking certiorari review. If this *689 were a writ of certiorari, the four-month statutory time limit would have begun to run, at the latest, from the July 1991 mayoral approval of the lease amendment (Matter of Save the Pine Bush v City of Albany, 70 NY2d 193, supra). Petitioners implicitly concede that under this writ of certiorari they are time barred and the petition would therefore have to be dismissed.
However, petitioners claim they are seeking a mandamus to compel the municipal respondents to perform their administrative duties as mandated by New York City Charter §§ 195, 203 and 1602 (3) (a). In a CPLR article 78 proceeding, petitioners can enforce by mandamus a body or officer’s failure to perform a duty mandated by law. Looking at petitioners’ arguments, it is clear petitioners essentially challenge municipal respondents’ failure to take appropriate actions allegedly mandated under the New York City Charter. Thus, petitioners do not seek, per se, to challenge any specific determination but rather seek to compel respondents to perform their mandated duties. In sum, this court deems petitioners’ challenge as one for mandamus to compel municipal respondents to perform their proper duties under the appropriate New York City Charter provisions.
In 1992 Brooklyn Borough President Howard Golden, a nonparty to this proceeding, requested that the Department of City Planning of the City of New York, also a nonparty to this proceeding, conduct a "fair share” assessment under New York City Charter § 203 and apply the "Criteria for the Location of City Facilities” to the premises at issue. On October 5, 1992, the Department of City Planning declined to do so, stating that: "the relevant ULURP action was approved in 1988 and the city entered into the lease for the building well before the adopted fair share criteria became effective in July 1991. However, neither the Charter (sections 203 and 204) nor the Criteria for the Location of City Facilities contain any provision for retroactive fair share assessment. Instead fair share considerations are evaluated by the Commission in conjunction with its review of Section 195 office space application or ULURP applications for site selection and acquisition. The fair share analysis is conducted by the applicant agency, not the Department of City Planning.”
Assuming this is a mandamus to compel, respondents imply that this aforementioned 1992 refusal to act starts the four-month time period, and thus, the proceeding is time barred. This contention appears unavailing.
*690 First, the language in CPLR 217 addressing the writ of mandamus speaks of the demand of "the petitioner”. The burden to prove that the Statute of Limitations has run is on respondents (see generally, Brush v Olivo, 81 AD2d 852, 853 [burden of proof for bar to Statute of Limitations is upon party asserting it]). While it is conceivable that the borough president acted on behalf of his constituents (i.e., the petitioners), no such claim is expressly made or proven by respondents. Thus, here, respondents have not met their burden of proving a demand was made by petitioners. Second, CPLR 217 speaks of the refusal by "the respondent”. This demand was made by a nonparty to a nonparty governmental body, and in fact allegedly the improper body to make such a demand to. Here, respondents have not shown that they ever explicitly refused a demand by petitioner to act. Thus, it is clear that no express demand by petitioners and refusal by respondents were made until this proceeding and subsequent opposition papers. In sum, the Department of City Planning’s 1992 refusal to act in response to the borough president’s 1992 demand cannot be used to bar this proceeding as untimely commenced.
Generally, before commencing a proceeding in the nature of mandamus it is necessary to make such a demand and await a refusal (CPLR 217; Austin v Board of Higher Educ., 5 NY2d 430; Matter of Bernstein v Industrial Commr. of State of N. Y., supra; see also, Matter of Central School Dist. No. 2 v New York State Teachers’ Retirement Sys., 27 AD2d 265, 268 [demand must be "reasonably prompt” or doctrine of loches will be applied]). Under mandamus, the Statute of Limitations does not run out until four months after that refusal (supra; CPLR 217). Citing Community Planning Bd. No. 4 v Homes for the Homeless (158 Misc 2d 184 [Sup Ct, NY County 1993]), petitioners contend their order to show cause and respondents’ cross motions should be deemed the demand and refusal respectively. In Community Planning, a procedurally similar action (i.e., tenants and neighbors challenging city body) deemed such a demand and refusal to be okay upon the plaintiffs’ order to show cause (i.e., the demand) and the defendants’ answer (i.e., the refusal) (supra). In that case, the court held that since the burden of proof is on the party asserting a Statute of Limitations bar and no proof was submitted by defendants of any earlier time-barred demands, the proceeding was not time barred (supra, at 187-188). Here, except for the order to show cause and respondents’ cross *691 motions no formal demand by petitioners and refusal by respondents have been asserted. Thus, this court follows the rationale espoused in Community Planning and lets this proceeding go forth on the merits.
As an aside, this court is mindful that its determination (i.e., that petitioners’ proceeding is in the nature of mandamus and the proceeding was not time barred) leaves open several potential problems. First, by not construing Brooklyn Borough President Golden’s request and subsequent response by the Department of City Planning as a demand and refusal for purposes of starting the running of the Statute of Limitations, future litigation challenging the City’s actions as not complying with the New York City Charter (e.g., the fair share assessment) may be brought by those individuals who have not previously made formal demands and been formally refused by the City. However, as discussed above, the respondents did not meet their burden of showing that Brooklyn Borough President Golden’s demand was actually made on behalf of petitioners or that the petitioner should be time barred because of that demand. Moreover, if the court construed this nonparty demand as binding petitioners, the court would leave open the possibility that future proceedings would be determined by the party that made the first demand whether or not that party was representative of those members of the public who opposed the City’s actions. Under that scenario, the Statute of Limitations would then run from the refusal of the nonparty demand and possibly before future representative petitioners could bring a CPLR article 78 proceeding challenging that refusal. In light of CPLR 217’s language, stating that the period is to run from "the respondent’s refusal, upon the demand of the petitioner to perform its duty” (emphasis added), the court deems that the demand and refusal must come from the actual petitioners and the actual respondents in the proceeding before the court.
Again, the court is aware that this may cause other community residents who oppose respondents’ actions to now make a demand and await respondents’ refusal to perform and then commence a CPLR article 78 proceeding, thus causing repetitious litigations. However, those future litigants must remember that loches can bar them from commencing a CPLR article 78 proceeding if their demand was not "reasonably prompt” (Matter of Central School Dist. No. 2 v New York State Teachers’ Retirement Sys., 27 AD2d 265, 268, supra). Here, other residents of the community are probably on notice *692 of the within proceeding and a future demand by such non-party residents opposing respondents’ action or inaction may be deemed too late.
In sum, the court is aware that the floodgates may be opened for other CPLR article 78 proceedings. However, the court is bound by the language of both CPLR 217 and the New York City Charter. The appropriate legislative bodies may need to address these aforementioned potential problems. One solution may be to allow for such CPLR article 78 proceedings, which address such community opposition to certain actions by the municipal respondents, to be deemed class actions. (CPLR art 9.) Under that solution, other community residents who were not actual party participants in the first CPLR article 78 proceeding can be deemed parties within the class. Thus, the potential for multiple CPLR article 78 proceedings on the identical issue would not happen. The court stresses that this is just one potential solution and is not suggesting that this is the only solution.
In conclusion, the court deems the petitioners’ proceeding as one seeking a mandamus to compel municipal respondents to comply with its duties under the New York City Charter. The Statute of Limitations has not run since the court following the rationale in Community Planning (158 Misc 2d 184, supra) deems petitioners’ order to show cause the demand and respondents’ papers to be the refusal. In any event, as seen below, the substantive arguments made by petitioner are unavailing and require dismissal of the petition.
MERITS
Turning to the merits, petitioners basically argue that municipal respondents must comply with the new New York City Charter §§ 195, 203 and 1602 (3) (a) and conduct a "fair share” analysis before locating the various HRA programs at the site. The crux of petitioners’ argument centers on the fact that the HRA programs originally slated at the time of the lease and then at the time of the amendment are different from those slated to be instituted now. Petitioners contend that the programs constitute the proposed "use” of the facility, and thus, a change in the programs is a change in the proposed use requiring compliance with sections 195, 203 and 1602. Respondents contend that the new New York City Charter was not effective at the time the lease was approved by the Board and, therefore, a "fair share” analysis is not required.

*693
New York City Charter §§ 195 and 203

Section 195, entitled "Acquisitions of office space”, states in pertinent part that:
"Acquisitions by the city of office space or existing buildings for office use, whether by purchase, condemnation, exchange or lease, shall be subject to the following review and approval procedure: * * *
"c. In reviewing any such acquisition, the commission shall apply the criteria for the location of city facilities provided for in section [203].”
Section 203, entitled "Criteria for location of city facilities”, states in relevant part that: "a. [Effective July 1, 1991], the mayor * * * shall file with the city planning commission proposed rules establishing criteria for (1) the location of new city facilities and (2) the significant expansion, closing or significant reduction in size or capacity for service delivery of existing facilities. The criteria shall be designed to further the fair distribution among communities of the burdens and benefits associated with city facilities.” The Mayor filed proposed rules setting forth the criteria to be followed under section 203.
It is undisputed that (1) the original lease was properly approved in 1988 by the Board of Estimate pursuant to the old New York City Charter § 67, (2) New York City Charter §§ 195 and 203 were not effective until July 1991, and (3) respondents have not followed New York City Charter §§ 195 and 203 when (a) instituting the amendment to the lease, and (b) changing the programs slated to be instituted in the HRA office space leased by the City.
To get around the July 1991 effective date of sections 195 and 203, petitioners state that: (1) section 195 is a mere reclassification of the old section 67, (2) the old New York City Charter § 67 required new Board of Estimate approval if an amendment to a lease was to be made, and thus, section 195 also requires new approval of any amendments to a lease, and accordingly, (3) section 203 applies because it is referred to in section 195’s language.
The old New York City Charter § 67 setting out the responsibilities of the Board of Estimate stated, in relevant part, that:
"The board shall exercise the powers and perform the duties imposed upon it by this charter, and shall:
"1. grant leases of city property and concessions for the use *694 of city property and enter into leases of property to the city for city use.”
Petitioners fail to cite any support for and research reveals no support for their contention that section 195 is a mere reclassification of the old section 67. Unlike section 67, section 195, which no longer speaks of the Board of Estimate, sets out a new review and approval procedure for the acquisition of office space. Thus, upon perusal of both sections, this court determines that section 195 is not a mere reclassification.
Even assuming that section 195 was a mere reclassification, petitioners’ contention that section 67 required new approval for any amendments to the leases is meritless. Petitioners’ sole support for this "new approval of lease amendment” argument is based on Bermont Operating Co. v City of New York (128 Misc 2d 653). The Bermont court held that the Board of Estimate should be allowed to approve certain options to renew the lease. The Bermont "option to renew” case is inapposite to this proceeding which concerns an amendment to the lease at issue. Research reveals no case law supporting petitioners’ argument. Section 195 does not address approvals for lease amendments. If the City Legislature intended section 195 to review and approve amendments to leases, it could have so stated.
In sum, petitioners’ aforementioned arguments are not persuasive to deem sections 195 and 203 applicable to this situation. Accordingly, to the extent that the petition seeks to compel respondents to comply with New York City Charter §§ 195 and 203 and conduct a "fair share” analysis it is dismissed as meritless.

New York City Charter § 1602

All the parties agree that the municipal respondents had to follow the mandates set forth in New York City Charter § 1602 when seeking an amendment to the lease. Petitioners contend that the notice requirements were defective since the HRA programs contemplated now are different from the ones set forth in the public hearing notice for the amendment.
Section 1602, entitled "Powers and duties of the commissioner”, states in pertinent part that:
"the commissioner shall have the power and it shall be the commissioner’s duty to perform all the functions and operations of the city of New York relating to * * * the acquisition, *695 disposition and management by the city of real property * * * including without limitation: * * *
"3. Real property. With respect to real property, the commissioner shall have the following powers and duties:
"(a) to purchase, lease, condemn or otherwise acquire real property for the city, subject to the approval of the mayor, and to sell, lease, exchange or otherwise dispose of real property of the city * * * No such purchase, lease, condemnation or other acquisition shall be authorized until a public hearing has been held with respect to such acquisition after the publishing of notice in the City Record at least ten days but not more than thirty days in advance of such hearing * * * In the case of a lease in which the city is to be tenant, the notice for the hearing required in this subdivision shall include a statement of the location and proposed use of the premises, and the term and annual rent of the proposed lease.” (Emphasis added.)
Petitioners assert that the proposed use stated in the notice was the different programs, and thus, a change in the programs equals a change in the proposed use. Therefore, petitioners argue that since the programs are now different the notice and hearing for the amendment were defective. Petitioners argue that if the programs now contemplated are to be put in place at the office space, respondents must again comply with section 1602. This "proposed use” argument is unavailing.
The original lease approved by the Board explicitly states the "Use” for the premises is for office space by HRA. The amendment approved by the Mayor also allows for the same use (i.e., office space for HRA). Despite petitioners’ contentions, today the "proposed use” for purposes of section 1602’s notice requirements is the same; that is office space for HRA. Efforts to contend that the proposed use is a particular program are unavailing. While HRA may have determined the particular programs to be put in place in this office space, nothing in the lease or the mayoral approval of the amendment prevents HRA, without new section 1602 approval, from changing its mind. As long as HRA uses it for office space, it is within the contemplated "proposed use” for purposes of New York City Charter § 1602. Thus, the section 1602 notice and hearing requirements, which mandate a statement of the proposed use, have been met.
In trying to comply with section 1602 for the amendment to *696 the lease, it appears respondents, by stating the proposed programs, gave more information than necessary. To deem the notice now defective because the programs are different, would have a future potential effect on the municipal respondents giving as little information as possible for fear any change in nonmandated notice plans would jeopardize the entire lease and amendment. Therefore, as a matter of law, section 1602 is not violated.*

Preliminary Injunction

In light of the above decision, petitioners’ request for a preliminary injunction is denied.
Accordingly, it is ordered that the petition is dismissed in its entirety.

 This court’s determination that the "proposed use” contemplated is the "office space by HRA” is strictly limited to the notice and hearing requirements under New York City Charter § 1602. The court is not addressing whether for purposes of the fair share criteria addressed in New York City Charter § 203 the change in the programs is a problem. Section 203 (a)’s language states that "[t]he criteria shall * * * further the fair distribution among communities of the burdens and benefits associated with city facilities”. Under section 203 the "fair share” criteria language would appear to demand a more exacting assessment of what actual programs would be instituted in the HRA office space. Thus, under section 203, respondents may not be able to assert that since the lease and amendment allow for HRA office space, HRA can have any programs it chooses in that space. However, respondents’ failure to comply with section 203 is not before this court (see, supra, at 692-694).