[635 NYS2d 958]

EAST 13TH STREET HOMESTEADERS' COALITION et al., Respondents, v DEBORAH WRIGHT, as Commissioner of the New York City Department of Housing Preservation and Development, et al., Appellants, et al., Respondents/ Defendants.

First Department, December 7, 1995

### APPEARANCES OF COUNSEL

*Alan G. Krams* of counsel, New York City *(Leonard Koerner* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellants.

*Jacqueline M.H. Bukowski* of counsel, New York City *(Stanley L. Cohen,* attorney), for respondents.

### OPINION OF THE COURT

TOM, J.

Respondents appeal from an order of the Supreme Court which annulled certain Peremptory Vacate Orders issued by the City of New York Department of Buildings (DOB) due to the dangerous and hazardous conditions of three City-abandoned apartment buildings inhabited by petitioners.

This action was commenced in or about October 1994 by petitioners, who were occupying, without permission, five New York City-owned buildings designated as 535, 537, 539, 541 and 545 East 13th Street, New York, New York[1] (the buildings will be referred to individually by their street address numbers). The complaint, which interposed numerous causes of action, was in response to the City's attempt to remove the petitioners so that the City could implement a Federally subsidized plan to rehabilitate the buildings and create 41 low-income housing units. The petitioners, asserting that they acquired ownership of the abandoned structures by way of adverse possession, also

---

1. The occupants of 535 East 13th Street subsequently withdrew from the litigation.

sought a preliminary injunction precluding the City from using self-help to remove them (see generally, Paulino v Wright, 210 AD2d 171, lv dismissed 85 NY2d 858).

On February 10, 1995, the IAS Court issued a temporary restraining order enjoining respondents from using self-help to eject petitioners from the subject building and directing a hearing on the preliminary injunction motion.

The respondents maintain that as a result of the IAS Court's order, an inspection of the buildings was made in order to aid respondents in preparing for the preliminary injunction hearing. DOB and New York City Department of Housing Preservation and Development (HPD) personnel thereafter determined that two of the buildings (541 and 545) were in such a hazardous condition as to constitute an imminent danger to the occupants' health and safety as to require complete evacuation. The inspectors also found the first floor of a third building (539) in the same condition and, thereafter, issued the Vacate Orders dated April 20, 1995.

At that juncture, the IAS Court had already commenced the preliminary injunction hearing and petitioners made an application, during the course of that hearing, for an order annulling the Vacate Orders. The IAS Court commenced an immediate hearing (literally, a hearing within the hearing) to review the propriety of the Vacate Orders and, on April 26, 1995, Justice Wilk entered an order annulling the Vacate Orders and directing the City to immediately present a plan for the making of the necessary repairs to the buildings while the petitioners remained in occupancy.

The City subsequently sought to appeal the order as of right and invoked its automatic statutory stay, and petitioners moved to dismiss the appeal and vacate the automatic stay. Respondents then cross-moved for leave to appeal in the event we determined that Justice Wilk's order was not appealable as of right.

By order dated May 25, 1995, this Court, inter alia, granted respondents leave to appeal and denied petitioners' motion to vacate the automatic stay exercised by the respondents which, in effect, permitted the execution of the Vacate Orders. By order dated June 22, 1995, this Court granted petitioners' motion for renewal of the May 25, 1995 order to the extent of directing the municipal respondents to seal the buildings once they were vacated and to keep them sealed pending final disposition by the Supreme Court. As a result, petitioners were ejected

from the subject buildings on May 30, 1995 and those buildings were sealed.[2]

The focus of this appeal is whether the condition of the three buildings in question posed an imminent danger to the safety and life of the occupants.

Testimony educed at the hearing revealed that on April 12, 1995, a group of HPD and DOB staffers, including engineers Andrew Hanna from HPD and George Gabourel from DOB and Chief Inspector Thomas O'Flaherty of the DOB, entered and inspected buildings 537, 539, 541 and 545, during which time they took approximately 150 photographs and four hours of video recordings. The pictures did not show all areas of the buildings and the inspectors had instructions not to enter certain individual apartments.

Mr. Hanna's engineering report, which was entered into evidence, noted that in 539, he observed that: partition walls had been removed throughout the building; sheetrock had been improperly installed and was not secured to the walls and ceilings; joists had been removed from the basement ceiling and replaced with undersized beams which were resting on deteriorating masonry pockets (the point where joists connect to the bearing wall); other basement joists were completely deteriorated, and the ceiling was in danger of collapsing; the public hall stairs were unstable and leaning and many treads were missing; the bricks and mortar on the parapet wall were severely deteriorated and in danger of collapsing; and cracks and loose mortar were visible at various locations on the exterior walls.

The DOB report, compiled by DOB engineer Gabourel, states that: undersized beams replaced joists; that interior stairs were "leaning to right" with treads pulling away from the wall; that other stairs were "leaning and sagging"; that a "sagging and spongy" floor in a third-floor apartment was caused by the removal of a relieving wall; and that a wood-burning stove with a flue to the roof was present, constituting a fire hazard.

Mr. Hanna's observations with regard to 541 were that: "the building is in imminent danger of collapsing"; the east exterior

---

2. After an incident on July 4, 1995, during which one of the vacated buildings was reentered, necessitating police action to once again enforce the Vacate Orders, the City sought a temporary restraining order to take certain steps to prevent a recurrence. After the application was denied by the IAS Court, a Justice of this Court ordered petitioners not to reenter the buildings and authorized the City to remove the rear fire escapes to make reentry more difficult.

wall is buckled inward in some areas and outward in others, which condition is extremely dangerous and marks the initial stage of collapse; floor joists between certain floors had been cut to provide access and as a result, the joists were inadequately supported; terra cotta bricks are loose throughout the basement ceiling, with obvious water leakage; wood lintels are completely deteriorated and unable to support the surrounding bricks; and the parapet wall is deteriorated and in danger of collapse. Mr. Hanna recommended the building be evacuated as soon as possible.

The DOB report prepared by Mr. Gabourel states, *inter alia*, that: the west side parapet is leaning over a floor onto the roof; the west side of the building has structural cracks throughout the top three floors; there are vertical cracks at the north interior stair and throughout the east wall; and that a fourth floor apartment has a floor which is spongy and is two to three inches lower than the hallway floor.

With regard to 545, Mr. Hanna noted that: the upper front portion of the exterior brick wall is structurally unstable with a horizontal deflection of approximately eight inches; the west side parapet wall is bulging inward; walls were removed in the third-floor rear apartment and improper shoring was installed; and a platform on the ground floor-rear of the building is in danger of collapsing.

Mr. Gabourel's report remarked that: the entire front wall is out of plumb approximately 12 to 18 inches and evidences severe cracking; a sidewalk shed was placed in front of the building to protect the public from a dangerous condition on the fifth floor; there is severe sagging adjacent to the interior stair line; stairs were sagging and defective at all levels; and the building appears "rearwards" because of the removal of interior relieving walls.

In opposition, petitioners called John Walsh, a professional engineer, who asserted that he inspected the buildings twice. Mr. Walsh offered the opinion that the buildings were not in imminent danger of collapse. Mr. Walsh agreed that sections of a bearing wall in 539 were removed which would lead to excessive deflection and that the wall should either be replaced or girders should be installed, but that the existing joists would not fail. Mr. Walsh also concurred that sheetrock was improperly fastened, that joists were undersized, and opined that the masonry pockets were not deteriorated, but simply "not complete". With regard to the stairs in 539, Mr. Walsh stated that he didn't believe they were unstable but that they were

slanted due to the "condition of the floor joists on the first floor".

As to 541, Mr. Walsh again proffered his opinion that the building was not in imminent danger of collapse. Mr. Walsh stated that there were two sections of the west wall that should be "rebuilt"; that vertical cracks were present in the building which he didn't consider structurally damaging, but which needed to be pointed and repaired; that the removed joists mentioned in the respondents' reports are not a problem and the wall "can be braced with some steel channels, welded and shaped"; that some of the terra cotta bricks in the basement were loose and others were missing; that there were additional signs of water leakage, but, as always, he declared this to be a fixable condition not posing a structural hazard; and that the parapet wall was deteriorated, but "not in danger of collapse".

Mr. Walsh agreed with the City's observations regarding the inward horizontal deflection of the exterior wall in 545, but characterized the condition as "stabilized by bracing in a top-floor apartment". On cross-examination, Mr. Walsh acknowledged that absent the bracing, there would be a danger of collapse of the wall into the building with the residual masonry falling onto the street. Mr. Walsh also opined that the wall would remain stable "until the wintertime", at which point "there is a danger of collapse". Mr. Walsh also noted that the west side parapet walls are bulging inward, but could be repaired.

At the conclusion of cross-examination, Mr. Walsh again restated that the buildings were not in danger of collapse, but when asked immediately thereafter if there are other professional engineers who might disagree with that opinion, Mr. Walsh simply answered "yes". Mr. Walsh also stated that he agreed with Mr. Hanna's observations about the buildings and his repair recommendations, and only disagreed with Mr. Hanna's conclusion that those conditions led to an imminent danger of collapse, endangering the occupants as well as passersby.

Petitioners also called James Morgan to testify, a Professor of Urban Design Studies who is active in community work. Mr. Morgan stated that he visited the subject buildings on numerous occasions and, while acknowledging that a great deal of work needed to be done, he concluded that none of the buildings was in danger of collapse. Remarkably, Mr. Morgan found the east wall of 541 to be "perfectly plane" whereas petitioners' own expert, Mr. Walsh, had previously testified that the

wall was not bonded, was hazardous, and should be repaired prior to the onset of winter.

In response to Mr. Walsh's testimony, Mr. Hanna, HPD's engineer, was called upon to testify and review the findings set forth in his written reports. Regarding 539, Mr. Hanna testified that one third of the joists in the basement were new and undersized and that the old, deteriorated joists were "completely rotted away because of the water damage at certain area and it was shored by a piece of wood which is not properly secured" and were not capable of supporting a "live" load. Mr. Hanna emphasized that the new joists were not properly seated and were resting on crumbling bricks. Mr. Hanna contended that 50% of the masonry pockets were "very very bad".

Mr. Hanna described 541 as the worst of all of the subject buildings because of the danger of collapse caused by the fact that the east wall is leaning in. Mr. Hanna noted that there was buckling and bulging present in the wall, and that it could go at any time. Mr. Hanna also noted that because of the warped condition of the wall, the joists were no longer properly seated, leaving the floors in danger of collapse. Once the floors collapsed, this would "trigger the collapse of the whole building." Mr. Hanna concluded that 541 could collapse "today or next year." Under cross-examination, Mr. Hanna repeated that the building will collapse.

With regard to 545, Mr. Hanna opined that the upper front portion of the exterior wall is buckling inwards approximately 8 inches, as is the west side parapet wall, and that partition walls had been removed, leading to the sagging of joists. Mr. Hanna stated that although the entire building, as a whole, is not in serious danger of collapse, certain specific areas will collapse if neglected. Mr. Hanna concluded that loose sheetrock in the buildings, while not related to the collapse of the entire structure, could itself collapse, causing injury to anyone standing below.

Respondents also called Thomas O'Flaherty, the Chief Inspector of Construction for the DOB, whose testimony substantially supported HPD's engineering report and the findings of Andrew Hanna. In addition to the testimony of Hanna, Mr. O'Flaherty observed in 539 wood-burning stoves were installed with flues running to the roof and, with regard to 545, he contended that a sidewalk shed was necessary to protect pedestrians because of the dangerous condition of the fifth floor.

Mr. Chang Park, a licensed architect who is employed as a Supervisor of Building Maintenance for HPD, testified that on April 12, 1995, he inspected 537, 539, 541 and 545 and observed that in 539, joists in the basement were undersized and exhibited very poor workmanship and that most of the masonry pockets were deteriorated and in a bad, unstable condition. Ron Livian, the Manhattan Borough Commissioner for the DOB, and a licensed professional engineer, testified, *inter alia*, as to the grounds upon which the Vacate Orders were issued.

The IAS Court found the testimony of respondents' witnesses, particularly that of Mr. O'Flaherty, to be less than candid and stated that "[i]t is not clear to me that the conditions as they currently exist are so hazardous they represent an immediate danger to the current occupants or to passersby". The IAS Court concluded that: "I do not believe that it is necessary for anybody to vacate the buildings while the repairs are being made. I expect that the plans will not include the need to vacate the buildings except to the extent that there has been testimony that for short periods of time certain targeted apartments may have to be emptied while certain repairs are being made. Except for that, the City is directed to take no steps to implement the vacate orders."

Respondents appeal and we now reverse.

The determination of the Commissioner to issue a Vacate Order is essentially an administrative one based upon the conditions existing in the subject buildings which, in the opinion of the Commissioner, posed a danger to life and property. The Commissioner, under the Administrative Code of the City of New York, is vested with broad discretion to issue Vacate Orders to protect the life, safety and well-being of occupants, and to enforce compliance with any law, rule or regulation within the jurisdiction of the department.

Administrative Code of the City of New York § 26-127 (b) states: "In case any order to remedy a condition imminently perilous to life or property issued by the commissioner or the department is not complied with, or *the commissioner certifies in writing that an emergency exists requiring such action, he or she may order and immediately cause any building, structure, place or premises (i) to be vacated*; and, also, if the commissioner determines such action is necessary to the preservation of life and safety, (ii) to be sealed, secured and closed." (Emphasis added.)

Administrative Code § 26-243 (c) states, *inter alia*: "Where, in the opinion of the superintendent, there shall be actual and

immediate danger that any structure or part thereof will fall so as to endanger life or property * * * the superintendent is hereby authorized and empowered to order and require the inmates and occupants of such structure or part thereof to vacate the structure forthwith. The police commissioner shall enforce such orders".

Administrative Code § 26-245 (a) states, *inter alia*: "In case, in the opinion of the superintendent, *any defective or illegal work in violation of or not in compliance with any of the provisions or requirements of this subchapter* or chapter one of title twenty-seven of the code shall endanger life or property, the superintendent * * * shall have the right * * * to order all further work to be stopped in and about such structure or premises, and to *require all persons in and about such structure or premises forthwith to vacate it*" (emphasis added; *see also,* § 26-127 [a]).

In the absence of a clear showing by petitioners that the administrative determination herein to issue the Vacate Orders is arbitrary and capricious or in any way irrational, such determination should not be disturbed (*see, Matter of Teachers Ins. & Annuity Assn. v City of New York*, 82 NY2d 35, 41; *Matter of Historic Albany Found. v Fisher*, 209 AD2d 135, 138; *Matter of Greenpoint Renaissance Enter. Corp. v City of New York*, 137 AD2d 597, 601, *lv denied* 72 NY2d 810).

The testimony of the expert witnesses for petitioners and respondents concerning the condition of the buildings is not diametrically dissimilar. Rather, Mr. Walsh, petitioners' primary expert witness, agreed with most of Mr. Hanna's assessments set forth in the HPD report and acknowledged that wet weather combined with fluctuating winter temperature could lead to serious stability problems throughout the buildings. With regard to 539, Mr. Walsh agreed that load-bearing partition walls had been removed and, although he characterized masonry pockets as incomplete rather than deteriorated, he agreed that they were unacceptable as joists "were not embedded in the masonry". As to the stairs in 539, Mr. Walsh stated that "[t]here are pieces of the stair missing as you go up, big sections of railing and maybe pieces of tread". Concerning the bricks and mortar on the parapet wall, Mr. Walsh stated that they are "severely deteriorated" but not in danger of collapsing, although he later added the caveat that "[t]he parapets should be repaired quickly before another winter comes and the buildings should at least be pointed down one floor from the top, *all the buildings, before the wintertime.*" (Emphasis added.)

Mr. Walsh acknowledged that the inner and outer layers of the east wall of 541 were not bonded and while the inner withe "seems straight", because of the lack of bonding, the separate withes will act as two separate walls. Mr. Walsh confirmed that the wall should be repaired before winter because the weather would cause further deterioration of the condition, possibly leading to instability. Mr. Walsh also opined that a portion of the west wall of 541 contained "a serious condition which needs pointing" and could result in a possibility of collapse if "not addressed before the coming winter". With regard to 545, Mr. Walsh agreed that there was an inward deflection of the interior wall noting, again, that it would be stable as long as the weather is good, or "until winter time".

In essence, Mr. Walsh's testimony could in no way be regarded as a ringing endorsement of petitioners' position as he agreed with most all of Mr. Hanna's observations concerning the existence of dangerous, unstable conditions. Some of these conditions include numerous internal load-bearing walls which have been removed; "severely deteriorated" bricks and mortar on parapet walls; undersized joists and joists which were cut and are resting on bricks that were not grouted into the wall; ends of the joists which were not attached to load-bearing walls with masonry; staircases which are tilting, missing treads and are pulling away from walls; floors which are sagging, uneven, and spongy; portions of stairs which are missing, including large sections of railings; sheetrock on ceilings and walls which is improperly mounted and in danger of falling; walls which need to be braced with steel channels, welded and shaped; illegally installed and dangerous woodburning stoves with flues running to the roof; and the inward deflection of exterior walls. Mr. Walsh also readily agreed without hesitation that all of the buildings needed to be pointed "before the wintertime" and that another professional engineer could disagree with his conclusion that the buildings are not in imminent danger of collapse.

It should be noted that the structures in issue are dilapidated buildings approximately one century old. While we sympathize with the plight of petitioners who were displaced from premises they allegedly inhabited for a number of years, the safety and well-being of the occupants and passersby are the paramount concern of this Court. The former inhabitants of these now sealed buildings consist not only of adults, but also children, who were exposed to the foregoing hazardous conditions on a daily basis. Further, without even considering

the more serious structural defects, the crumbling and decaying condition of the stairs and common hall areas standing alone posed a threat to the life and safety of all of the occupants who had to constantly traverse these areas.

The decision to issue a Vacate Order does not reside exclusively, as petitioners urge, on the determination of whether or not the buildings are on the immediate precipice of collapse. Rather, other factors, such as danger to the safety, health and well-being of occupants, as well as passersby, are to be considered in issuing a Vacate Order. Mr. Livian, the DOB's Borough of Manhattan Commissioner, whose testimony Justice Wilk found to be "absolutely credible," stated during the hearing that a vacate order "is an order from the Department of Buildings issued to a building or a structure when we find that there is imminent danger to life, safety of the occupants." When asked if that necessarily meant a danger of collapse, Mr. Livian testified that it could very well include other conditions.

Administrative Code § 27-2139 states:

"a. Any dwelling or part thereof, which, because of a structural or fire safety hazard, defects in plumbing, sewage, drainage, or cleanliness, or any other violation of this code or any other applicable law, constitutes a danger to the life, health, or safety of its occupants, shall be deemed to be unfit for human habitation.

"b. The department *may order or cause any dwelling or part thereof which is unfit for human habitation to be vacated.*" (Emphasis added.)

We find that there was ample evidence to support the Commissioner's finding of conditions perilous to life and property, that such finding was neither arbitrary nor capricious, and that the Vacate Orders should stand and the buildings should remain sealed.

In view of Justice Wilk's order directing the City to "immediately" present a plan for making the repairs, it is apparent that the Court was aware of the hazardous conditions existing in the buildings and the fact that those conditions required attention forthwith. However, the order is premature at this stage of the proceeding since petitioners have not demonstrated a legal right to be occupying the premises or that the City had any legal obligation to make the repairs.

Accordingly, the order of Supreme Court, New York County (Elliott Wilk, J.), which was entered on April 26, 1995 and which enjoined the ejection of petitioners from the subject

buildings at 539, 541 and 545 East 13th Street, New York, New York, is unanimously reversed, on the law and the facts, without costs, the restraining order is vacated, and the buildings are to remain sealed.

ROSENBERGER, J. P., ELLERIN, WILLIAMS and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered April 26, 1995, reversed, on the law and the facts, without costs, the restraining order vacated, and the buildings are to remain sealed.