OPINION OF THE COURT
Martin Schoenfeld, J.
Plaintiff West 97th-West 98th Streets Block Association now moves for a preliminary injunction enjoining defendants from any further rehabilitation or occupancy of 305 West 97th Street (the Building). Defendant Volunteers of America of Greater New York (VOA) now cross-moves to dismiss the complaint pursuant to CPLR 3211 (a) (5) (Statute of Limitations) or, alternatively, pursuant to CPLR 3211 (a) (7) (failure to state a cause of action). For the reasons set forth herein, VGA’s request to dismiss plaintiffs State Environmental Quality Review Act (SEQRA) and City Environmental Quality Review (CEQR) claims is granted, and all other requests for relief are denied.
Background
Up until approximately May of 1989 the Building was a privately owned single room occupancy (SRO), i.e., a building where some or all tenants share kitchen and/or bathroom *323 facilities. Plaintiff claims that during this period the occupants constituted "an intimidating, harassing, drug-dealing, violent force that was virtually uncontrollable” and that the occupants littered, dealt drugs, fought, fired guns, harassed women, burgled apartments, threatened people with weapons, stole laundry out of laundry rooms, and made loud noises at all hours.
In 1986 the city’s Department of Housing Preservation and Development (HPD) proposed that VOA develop the property under the city’s "Single Room Occupancy Development Loan Program.” From December of 1986 through May of 1989 VOA engaged in "extensive negotiations with the tenants of the building, the residents of the surrounding community, employees and commissioners of various city agencies, the owners, the mortgage holder, architects, lawyers, and contractors concerning the purchase and rehabilitation of the building.”
In 1989, using money obtained from HPD, VOA took title to the Building. Shortly thereafter, the Building, which had physically deteriorated to the point where it was no longer habitable, was emptied of tenants in accordance with an order in Joseph v West 97th St. Hous. Dev. Fund (index No. 53556/ 89, Sup Ct, NY County, July 6, 1989). This order specifically provided that the former tenants would be allowed to return upon completion of the renovation. The building was then "gutted” and, essentially, reconstructed.
VOA originally proposed housing "former residents, 'work-ready’ homeless, and rehabilitated alcohol abusers,” the latter to be referred and funded by the city’s Human Resources Administration (HRA). VOA "promised” sufficient alcohol counsellors and security personnel. However, on or about March 26, 1991, VOA announced that a sizable mentally ill population (1/3 of the building residents) would be referred by the city’s Department of Mental Health (DMH). VOA also announced reductions in building staff and social service personnel.
VOA states that there has been no change in the goal of the project: to turn a building in "deplorable” condition into a "decent, permanent single room occupancy [for] poor people.” VOA notes that the Building previously was, and will still be, an SRO, and that the total square footage of the Building will be the same. Furthermore, approximately 25 former tenants will be returning to the Building. In the words of VOA, "many of the [new] tenants [are] currently residing on the 'Upper *324 West Side’ albeit some of them may now be sleeping on sidewalk gratings.” Funding for staff is to come from DMH and HR A. VO A claims that it has hired a building manager and that the Building is on the verge of occupancy.
Plaintiff claims that "the financial viability of this project is extremely tenuous,” that the project may not actually receive the amounts budgeted as future governmental funding, that there will be inadequate social service and supervisory personnel, that there are approximately 30 "similar facilities” within a one-half mile radius of the Building, and that the project will lead to increased crime in the neighborhood. Their complaint purports to assert causes of action for violations of (1) the city’s Criteria for the Location of City Facilities (the Fair Share Rules); (2) the city’s Uniform Land Use Review Procedure (ULURP); and (3) the New York State Environmental Quality Review Act and the City Environmental Quality Review rules.
Discussion
Different standards apply to a motion to dismiss for failure to state a cause of action and to a motion for a preliminary injunction. "[A] complaint should not be dismissed on pleadings so long as, giving plaintiff the benefit of every possible favorable inference contained in his allegations, a cause of action exists.” (Donnelly v Morace, 162 AD2d 247, 247-248 [1st Dept 1990].) On the other hand, in order to be granted a preliminary injunction a movant must show (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of a preliminary injunction; and (3) a balancing of the equities which favors the movant’s position. (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990].) Furthermore, a preliminary injunction is a "drastic” remedy, and the movant must make a "clear showing” of each of these elements. (Faberge Intl. v Di Pino, 109 AD2d 235, 240 [1st Dept 1985].)
The Fair Share Rules
The city’s "Fair Share Rules,” approved by the city Planning Commission on December 20, 1990, establish "criteria for (1) the location of new City facilities and (2) the significant expansion * * * of existing facilities.” Their general purpose is "to foster neighborhood stability and revitalization by furthering the fair distribution among communities of city facilities. Toward this end, the city shall seek to: a) site facilities equitably by balancing the consideration of community needs *325 for services, efficient and cost effective service delivery, and the social, economic and environmental impacts of city facilities upon surrounding areas * * * f) lessen disparities among communities in the level of responsibility each bears for facilities serving citywide or regional needs; g) preserve the social fabric of the city’s diverse neighborhoods by avoiding undue concentrations of institutional uses in residential areas.” (Fair Share Rules art 2 [Purpose and Goals].)
The Rules provide, inter alla, that
"6.51 Undue concentration or clustering of city and non-city facilities providing similar services or serving a similar population should be avoided in residential areas.
"6.52 Necessary support services for the facility and its residents should be available or provided.” (Fair Share Rules art 6 [Criteria for Siting or Expanding Regional/City Wide Facilities].)
Plaintiff claims (1) that since HPD, HRA and DMH are all city agencies, the project is covered by the Fair Share Rules; (2) that the project’s implementation and funding are occurring subsequent to the effective date of the Fair Share Rules, and are thus covered thereunder; (3) that there already is an "undue concentration” of facilities serving a "similar population” on the Upper West Side; and (4) that the project will not have "necessary support services”. VOA claims (1) that the Fair Share Rules do not apply because they became effective July 1, 1991, after the project was almost completed; (2) that the Building is not a "facility”; (3) that the project is not covered by the Fair Share Rules because it is merely the renovation of an existing facility; (4) that the project is not covered by the Fair Share Rules because it is a "State”, rather than a "city” project; and (5) that the Fair Share Rules do not apply because the project is being run "privately.”
This court is of the opinion that the complaint states a cause of action under the Fair Share Rules based on the involvement of various city agencies and the fact that the project, in particular the funding, was not fully implemented at the time the Fair Share Rules became effective. Also, in view of the ongoing funding determinations and actions it is not clear that the complaint is untimely. However, preliminary relief must be denied because in light of the numerous issues of Fair Share applicability vel non noted above, plaintiff has failed to make a clear showing of a likelihood of success on the merits. In particular, this court cannot determine, *326 based solely on the parties’ submissions, whether the project should be viewed as "public” or "private,” or whether it should be considered "new” or merely a "renovation.” Preliminary relief also would not be appropriate in light of the advanced stage of the project. See Golden v Metropolitan Transp. Auth. (126 AD2d 128, 132-133 [2d Dept 1987]):
"In the case now under review, the project has gone beyond the planning phase and has actually been implemented. We do not read [the] cases as holding that, as a matter of law, any actions taken pursuant to an invalid agency determination must be 'undone,’ or that, as a matter of law, the court must remedy an apparent * * * violation by ordering a return to the status quo ante, that is, to conditions as they existed before the agency action was taken.
"Various Federal courts, in construing the analogous provisions of the National Environmental Policy Act, have concluded that broad injunctive relief may not always be appropriate. In Steubing v Brinegar (511 F2d 489, 495) the United States Court of Appeals for the Second Circuit noted that injunctive relief may be inappropriate where 'construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan.’ Federal courts have frequently denied injunctive relief where those claiming to have been aggrieved by violations of Federal environmental law fail to commence their legal proceedings until after significant investments have been made in the challenged project.”
ULURP
New York City Charter § 197-c, "Uniform land use review procedure”, provides, in pertinent part, as follows: "applications by any person or agency for changes, approvals, contracts, consents, permits or authorization thereof, respecting the use, development or improvement of real property subject to city regulation, shall be reviewed pursuant to a uniform review procedure in the following categories * * * (8) Housing and urban renewal plans and projects pursuant to city, state and federal housing laws.”
Plaintiff claims that the proposed contracts between DMH and VGA and between HRA and VGA are "contracts respecting the use of real property” and that since the loan agreement between HPD and VGA was made pursuant to the New York State Private Housing Finance Law, the project is a "housing plan pursuant to state law.” Plaintiff notes that a *327 privately owned, 72-unit SRO will become a city-funded 100-unit facility with some persons referred by DMH.
VO A claims (1) that a program designed to aid a private organization rehabilitate a single property does not constitute a "housing plan pursuant to state law”; and (2) that loans made by HPD pursuant to the New York State Private Housing Finance Law are not subject to review under ULURP since New York City Charter § 1802 (6) (d) vests HPD with the power and duty to "respect the city in carrying out the provisions of the private finance housing law”, and thus HPD has sole and plenary discretion over these funds (see, Danisi v City of New York, NYLJ, Jan. 6, 1981, at 10, col 6 [Sup Ct, Bronx County]; Tenants Council v Koch, NYLJ, Dec. 3, 1980, at 13, col 5 [Sup Ct, Queens County]).
Once again we are of the opinion that plaintiff has sufficiently pleaded a cause of action, but that a preliminary injunction may not issue thereon. Any agency determinations that one would normally think of as constituting a "housing plan,” such as the determination to fund the purchase and rehabilitation of the Building, were made well over four months prior to the institution of this action in or about September of 1991, and thus may no longer be challenged. (See, CPLR 217 [discussed infra].) However, the proposal for HRA and DMH contracts could conceivably be proposals or "applications by any person * * * for * * * contracts * * * respecting the use * * * of real property subject to city regulation * * * in the * * * categor[y] * * * [of a] [h]ousing * * * pla[n] * * * pursuant to city [and] state * * * housing laws.” In Matter of Plotnick v City of New York (148 AD2d 721, 725 [2d Dept 1989]), where the project at issue was changed before final implementation, the court stated that "there are significant differences in the impacts on a community from the placement in its midst of housing for homeless singles as opposed to homeless families and we do not agree that such a modification is a minor one.” Here, the change to include DMH referrals in the project may also be significant, but the court cannot make this determination solely on the parties’ submissions. Since the plaintiff has not made a clear showing of a likelihood of success on the merits, it may not be granted a preliminary injunction. (See also, discussion of Golden v Metropolitan Transp. Auth., supra.)
Danisi (supra) and Tenants (supra) are readily distinguishable and not controlling here since in those cases the city Housing Authority owned the properties at issue. (Cf., Incorpo *328 rated Vil. of Nyack v Daytop Vil., 78 NY2d 500 [in which the Court of Appeals recently held that the operator of a residential drug treatment facility must comply with local zoning laws, which are not preempted by the section of the State Mental Hygiene Law governing substance abuse facilities].)
SEQRA and CEQR
The New York State Environmental Quality Review Act (SEQRA) (codified in ECL 8-0101 et seq.) and the regulations promulgated thereunder (6 NYCRR 617.1 et seq.) were enacted for the purpose of "incorporating] the consideration of environmental factors into the existing planning, review and decisionmaking processes of State * * * and local government agencies at the earliest possible time. To accomplish this goal, SEQR requires that all agencies determine whether the actions they directly undertake, fund or approve may have a significant effect on the environment, and, if it is determined that the action may have a significant effect, prepare or request an environmental impact statement.” (6 NYCRR 617.1 [c].) The New York City Environmental Quality Review Order (CEQR) was promulgated to implement SEQRA within the city. (NY City Executive Order No. 91, Aug. 24, 1977.)
It is uncontested that neither an environmental impact statement (EIS) nor a statement of reasons why one is not necessary has been prepared in the instant case.
CPLR 217 (1) provides, in relevant part, as follows: "[A] proceeding against a body or officer must be commenced within four months after the determination to be reviewed becomes final and binding upon the petitioner or the person whom he represents in law or in fact.”
Proceedings pursuant to SEQRA and CEQR challenging an agency’s determination to proceed with a project like the instant one are governed by CPLR 217. (See, Matter of Board of Visitors—Marcy Psychiatric Center v Coughlin, 60 NY2d 14 [1983]; Citizens for Envtl. Safety v New York State Dept. of Envtl. Conservation, 134 AD2d 935 [4th Dept 1987].) In Matter of Wing v Coyne (129 AD2d 213, 216-218 [3d Dept 1987]), Justice Weiss expounded at length on limitations issues relevant to the instant case:
"a four-month period of limitations pertains to proceedings to review SEQRA determinations * * * However, since SEQRA determinations are often preliminary steps in a project’s decision-making process, the Statute of Limitations be *329 gins to run only when that decision-making process is completed, i.e., when the determination is 'final and binding’ * * * An assessment of when a decision has been finalized becomes more difficult when, as here, an ongoing planning and approval process exists and no permit or certificate of approval are to be issued triggering the SEQRA Statute of Limitations * * * In essence, we must analyze what the determination sought to be reviewed is and when an impact upon petitioners occurred * * *
"Where an agency adopts an ordinance committing itself to a definite course of future activities, such determination constitutes an “iaction’ within the meaning of SEQRA and, concomitantly, a final determination’ for Statute of Limitations purposes * * * The subsequent implementation of a finance mechanism * * * has nothing to do with the adequacy of respondents’ SEQRA determinations.” (Emphasis added.)
Here, since HPD committed itself to the project in 1989, the limitations period as to that basic decision began running at that time. However, the recent determination to alter the make-up of the occupants of the Building may have occurred within four months of the commencement of this suit, which was in September of 1991.
VO A argues, essentially, (1) that this determination was not an "action” within the purview of SEQRA, and (2) that, in any event, if it was an "action,” it was a "Type II action.”
ECL 8-0109 (2) provides, in part, as follows: "all agencies [or applicants] shall prepare, or cause to be prepared * * * an environmental impact statement on any action they propose or approve which may have a significant effect on the environment.” (Emphasis added.) Pursuant to ECL 8-0105 (4) (i), "actions” include: "projects or activities supported in whole or [in] part through contracts * * * loans, or other forms of funding assistance from one or more agencies”. Pursuant to 6 NYCRR 617.2 (b), "actions” include:
"projects or physical activities, such as construction or other activities that may affect the environment by changing the use, appearance or condition of any * * * structure, that * * *
"(ii) involve funding by an agency”.
Pursuant to CEQR § 1 (a): "Action means an activity of an agency * * * including but not limited to * * * (1) non-ministerial decisions on physical activities such as construction * * * which change the use or appearance of any structure, (2) non-ministerial decisions on funding activities such as the *330 proposing, approval or disapproval of the contracts, grants, subsidies, loans * * * or other forms of direct * * * financial assistance.”
VOA claims that they simply "restored” a facility to habitability. However, a determination to fund the placement of clients of DMH in a charitably run SRO may be an "action” as delineated above. Nevertheless, we need not (and do not) decide whether there was any "action” here since we find that if there was any "action” it was "Type II action.”
Pursuant to 6 NYCRR 617.13 (a): "Actions or classes of actions which have been determined not to have a significant effect on the environment are classified as Type II actions, and do not require environmental impact statements or any other determination or procedure under [SEQRA].” (Emphasis added.) Pursuant to 6 NYCRR 617.13 (d) (15):
"The following actions are Type II actions * * *
"(15) routine or continuing agency administration and management, not including new programs or major reordering of priorities.”
In Upper E. Side Coalition v Board of Estimate (NYLJ, Aug. 2, 1989, at 17, col 5 [Fingerhood, J.]), the court found (at 18, col 2) that HRA funding of a "service center” providing social and vocational services for homeless persons was a "routine or continuing agency administration and management”:
"Funding the proposed service center * * * is a routine city action which does not require an EIS prior to implementation. HRA * * * has executed thousands of similar contracts for social service facilities, which contracts have been approved * * * without an environmental review. For example, HRA has contracts funding day care centers, senior citizen centers, foster care and several outreach centers for homeless people that are run by private groups * * *
"The proposed service center clearly is a Type II activity under SEQRA and CEQR and no environmental review is required”.
In Greentree at Murray Hill Condo v Good Shepherd Episcopal Church (146 Misc 2d 500, 508-510 [Sup Ct, NY County 1989] [complaint dismissed]), Justice Leonard Cohen similarly held that a small percentage of HRA funding for a modest homeless shelter program in a church was exempt from SEQRA and CEQR review because the funding constituted a "Type II” action as defined in 6 NYCRR 617.13 (d) (15).
Here, the determination to include clients of the city’s DMH as occupants of the Building must be viewed, in context, *331 as "routine * * * agency administration” by DMH and/or HRA. Thus this determination is a "Type II” action, and plaintiffs SEQRA/CEQR claims must fall on this ground alone. Furthermore, even if the instant project were held subject to SEQRA/CEQR, plaintiff would not be entitled to a preliminary injunction this late in the game under Golden v Metropolitan Transp. Auth. (supra). Finally, we note that the former tenants of the Building have an overriding legal and equitable claim to return to the Building pursuant to Justice Cohen’s order of July 6, 1989. (See also, Spring-Gar Community Civic Assn. v Homes For Homeless, 149 AD2d 581, 582 [2d Dept 1989] [Supreme Court correctly denied injunctive relief to plaintiff neighborhood organization since its fears of increased crime near a homeless shelter were "speculative”].)
Conclusion
Whether or not this is a NIMBY (Not In My Back Yard) suit, it is certainly one of many cases challenging the placing of a social service facility on the basis that the placing violated city "land-use” procedures and State environmental law. Here, to the limited extent that certain recent decisions and actions may be changing the nature of the project at issue, they may also have triggered application of the city’s Fair Share Rules and Uniform Land Use Review Procedure. On the other hand, this court cannot see how every such change could trigger application of the State’s environmental review law, especially in light of the express exemption for "routine or continuing agency administration and management.” Many expectations, plans and decisions regarding the city’s economy and social services have changed in the last two years; each change cannot trigger a new "environmental” review.
Finally, while plaintiff may be reacting responsibly and in good faith to relatively recent events, this court thinks it would be inequitable to preliminarily enjoin the occupancy of a recently rehabilitated low-income SRO by former residents (protected by a court order) and persons in need of help, especially during these economically troubled times.
Thus for the reasons set forth herein, VGA’s request to dismiss plaintiffs SEQRA and CEQR claims is granted; plaintiffs request for a preliminary injunction is denied; and all other requests for relief by either side are denied.