Wall St. Garage Parking Corp. v New York Stock Exch. (2004 NY Slip Op 24097)

Wall St. Garage Parking Corp. v New York Stock Exch.

2004 NY Slip Op 24097 [3 Misc 3d 1014]

March 12, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 18, 2004

[*1]
Wall Street Garage Parking Corp., Plaintiff,
v
New York Stock Exchange, Inc., Defendant.
Supreme Court, New York County, March 12, 2004

APPEARANCES OF COUNSEL

Jenkens & Gilchrist Parker Chapin LLP, New York City (Stephen F. Harmon of counsel), for plaintiff. Milbank, Tweed, Hadley & McCloy LLP, New York City (Douglas Henkin and Anthony J. Rotondi of counsel), for defendant. Michael A. Cardozo, Corporation Counsel (Janet V. Siegel of counsel), for City of New York.

{**3 Misc 3d at 1015} OPINION OF THE COURT

Walter B. Tolub, J.
By this proceeding, plaintiff seeks to enjoin the defendant from blocking access to Exchange Place in lower Manhattan and to prevent the stop and inspection of vehicles exiting from plaintiff's parking garage.
Plaintiff owns and operates a parking garage located at the rear of a building at 45 Wall Street. The entrance and exit ramps to plaintiff's garage are located on Exchange Place between William Street and Broad Street. The defendant is the New York Stock Exchange, Inc. (NYSE), the oldest and largest of all United States stock exchanges. The NYSE operates offices located at 11 Wall Street, 18 Broad Street, 20 Broad Street and 30 Broad Street.

History

In recent years, the issue of security surrounding major corporate entities and prominent New York landmark locations has become of increased importance. Many of New York City's most recognizable businesses and buildings have worked diligently to increase security in the hopes of keeping their tenants and visitors safe from any harm that might befall them.
The New York Stock Exchange is no stranger to the implementation of security measures. As one of the oldest and most famous financial institutions, the NYSE is home to several thousand employees and traders, and receives countless business visitors annually. Tourists flock to it, film makers have immortalized{**3 Misc 3d at 1016} it, and unfortunately but undoubtedly, there are people in this world that would like to destroy it.
In response to security concerns, in the spring of 1996, the New York Police Department (NYPD) implemented several major traffic changes around the perimeter of the NYSE that were designed to thwart attacks by vehicles carrying explosive devices. In particular, the intersection at Wall Street and Broadway was closed to traffic, as was New Street between Wall Street and Exchange Place. Traffic patterns were then rerouted so as to only allow traffic northbound on the eastern side of Broad Street. The western side of Broad Street, blocked by a metal fence running from Exchange Place to Wall Street, was closed to vehicular traffic (affidavit of James C. Esposito ¶¶ 5-7).
In the fall of 1998, in response to security concerns following a bomb scare adjacent to 2 Broad Street, the NYPD implemented additional security measures in the area surrounding the NYSE. Most notably, the NYPD closed the sidewalks surrounding the NYSE's building at 11 Wall Street to pedestrian traffic from 6:00 p.m. to 8:00 a.m. (affidavit of James C. Esposito ¶ 8).
With security an ever-growing concern, in March 2001, the NYSE increased NYPD presence [*2]in the vicinity through their utilization of the NYPD Paid Detail Program.[FN1]

Under this program, off-duty uniformed police officers were deployed outside of NYSE buildings in an effort to maintain a police security presence.
In response to the terrorist attacks on September 11, 2001, the NYPD effectuated a multiblock security zone surrounding the NYSE. Upon further assessment, the NYPD closed the intersections of Wall Street and Broadway; Nassau Street and Pine Street; Wall Street and William Street; William Street and Exchange Place; Broad Street and Beaver Street; Beaver Street and New Street; and Broadway and Exchange Place, thereby creating a "secure zone" around the NYSE. These intersections were initially blocked using concrete "jersey barriers," which were later replaced by weighted pickup trucks, and have since been enhanced through the placement of additional vehicles and concrete {**3 Misc 3d at 1017}planters designed to deter improvised vehicle bomb attacks in New York City's financial center.[FN2]

Indeed, the NYPD's Counter-Terrorism Bureau has concluded that the security measures implemented in the area surrounding the NYSE since the September 11 attacks should be maintained (affidavit of John Colgan ¶ 4). However, while the NYPD created and patrolled the initial security zone, and although the NYPD maintains a heavy presence in this area through general patrols and Hercules Teams, it is the NYSE security team that currently maintains the perimeter and street closures surrounding the NYSE.[FN3]

Thus, at the present time, a private police force controls the public streets in the vicinity of the New York Stock Exchange.
Notwithstanding the security issues, which all parties concede are extremely important, the fact remains that many businesses have suffered as a result of post-September 11, 2001 security measures. In this case, plaintiff owns and operates a parking garage located on Wall Street with entrance and exit ramps located on Exchange Place between William Street and Broad Street, bordering the NYSE security zone.[FN4]
[*3]
Prior to September 11, 2001, plaintiff enjoyed a lucrative parking business, housing on average 150 to 160 vehicles per day. Following both the attacks and the implementation of the subsequent security measures in 2001, plaintiff's business dropped significantly. Although plaintiff did not offer an estimate of lost business for the time period from September 11, 2001 to December 31, 2002, plaintiff claims that in 2003 an average of 68 cars parked daily in the garage.
In February 2004, the City of New York notified the NYSE of necessary construction at the corner of Exchange Place and William Street that would require the closure of that intersection for {**3 Misc 3d at 1018}approximately six to eight weeks (affidavit of James C. Esposito ¶ 17). As a result of the construction, vehicles using plaintiff's garage would no longer be able to enter or exit the garage without entering the secure zone surrounding the NYSE and being subjected to inspection by NYSE security.[FN5]

In an effort to accommodate the patrons utilizing plaintiff's garage and to minimize the wait time for vehicle inspection, the NYSE relocated one of its two canine bomb-sniffing teams to a position outside of plaintiff's garage between 3:00 p.m. and 6:00 p.m. Notwithstanding this effort, plaintiff claims that his business has continued to suffer; patrons often have to endure longer waiting periods for security checks prior to being able to leave the garage, and many have not returned. Plaintiff estimates that between February 1 and February 20, 2004, an average of 65 patrons parked their vehicles daily. From February 21 to March 2, 2004, that number dropped to an average 38 vehicles daily, and on March 3, 2004, plaintiff reported only 25 vehicles parked in his garage (affidavit of Joseph Vassallo in support of preliminary injunction and temporary restraining order ¶¶ 6, 7, 11).
Plaintiff brings the instant action seeking relief from what is characterized in the complaint and supporting motion papers as the unlawful security system implemented by the New York Stock Exchange (complaint ¶ 12; plaintiff's mem of law at 3).

Discussion

The instant application arose after access to plaintiff's parking garage was drastically limited when the City of New York commenced road construction at the only publicly accessible means of ingress and egress currently available to plaintiff. As a result of this construction, all vehicles wishing to park in plaintiff's garage must enter and exit the garage by traveling through the NYSE "secure zone," and consent to searches made by NYSE security personnel and bomb-sniffing canine teams.
The essence of plaintiff's complaint is twofold: (1) the security zone maintained by the NYSE constitutes a public nuisance, has caused special damages, and thus entitles plaintiff to a preliminary injunction, and (2) the NYSE's operation of a private police force that controls and conducts searches on public thoroughfares is illegal.{**3 Misc 3d at 1019}

Preliminary Injunction

A preliminary injunction is a provisional remedy designed to maintain the status quo between [*4]the parties during the course of litigation (Uniformed Firefighters Assn. of Greater N.Y. v City of New York, 79 NY2d 236 [1992]; Barr, Altman, Lipshie and Gerstman, New York Civil Practice Before Trial § 17:03 [James Publ 2001-2002]; CPLR 6301). The remedy lies within the sound discretion of the trial court, but is one that is considered drastic (Borenstein v Rochel Props., 176 AD2d 171 [1st Dept 1991]). As such, the remedy is only appropriate where the moving party has established (1) a likelihood of success on the merits of the action; (2) irreparable harm absent issuance of a preliminary injunction; and (3) a balancing of the equities in favor of the movant (Aetna Ins. Co. v Capasso, 75 NY2d 860 [1990]; Doe v Axelrod, 73 NY2d 748, 750 [1988]). Allegations that are bare or merely conclusory are deemed insufficient for this purpose (Doe, 73 NY2d 748, 750 [1988]; Business Networks of N.Y. v Complete Network Solutions, 265 AD2d 194 [1st Dept 1999]).

Public Nuisance

It is well established that a public nuisance under contemporary New York law 
"consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons" (Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d 564, 568 [1977] [citations omitted], rearg denied 42 NY2d 1102 [1977]). Success on a claim of public nuisance requires that plaintiff prove by clear and convincing evidence "1. the existence of a public nuisance . . . ; 2. . . . conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and 3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of that public nuisance" (National Assn. for Advancement of Colored People v AcuSport, Inc., 271 F Supp 2d 435, 483 [ED NY 2003]). 
In addition to these requirements, plaintiff, as a private individual seeking redress under a claim of public nuisance, must also establish that the type of harm suffered is a "special injury beyond that suffered by the community at large" (532 Madison Ave. Gourmet Foods v Finlandia Ctr., 96 NY2d 280, 292 [2001], rearg denied sub nom. 5th Ave. Chocolatiere v 540 Acquisition Co., 96 NY2d 938{**3 Misc 3d at 1020} [2001]; see also National Assn. for Advancement of Colored People, 271 F Supp 2d 435, 482 [2003]; Leo v General Elec. Co., 145 AD2d 291 [2d Dept 1989]; Graceland Corp. v Consolidated Laundries Corp., 7 AD2d 89 [1st Dept 1958], affd 6 NY2d 900 [1959]).

It is well established under New York law that the primary purpose of streets is use by the public for travel and transportation, and consequently, the unlawful obstruction of a public street without express authority is not only a violation of section 19-107 of the Administrative Code of the City of New York, but also constitutes a public nuisance (Callanan v Gilman, 107 NY 360, 365 [1887]; O'Neill v City of Port Jervis, 253 NY 423, 428 [1930]; see also 532 Madison Ave. Gourmet Foods, 96 NY2d 280, 292-293 [2001]; Village of Stillwater v Hudson Val. Ry. Co., 255 NY 144 [1931]; Cassel v City of New York, 167 App Div 831, 841 [1st Dept 1915]; Broad Exch. Co. v Curb Stock & Bond Mkt. of N.Y., 117 Misc 82 [Sup Ct, NY County 1921]). Moreover, assuming arguendo that a landowner had a right to obstruct part of a sidewalk in front of their premises, courts have held that the "obstruction of a public street or sidewalk beyond the reasonable uses permitted to abutting owners" also constitutes a public nuisance (Graceland Corp., 7 AD2d 89, 90 [1958]).
This case presents a situation where a private entity, the New York Stock Exchange, has [*5]assumed responsibility for the patrol and maintenance of truck blockades located at seven intersections surrounding the NYSE. Although these blockades were created by the NYPD in the aftermath of September 11, no formal authority appears to have been given to the NYSE to maintain these blockades and/or conduct security searches at these checkpoints.
The court is loathe to characterize the need for heightened security around the NYSE, or for that matter, any location throughout this great city as being a public nuisance. Nonetheless, the fact remains that there are legal methods by which these closures could have been effectuated, and in failing to do so, the closure of these intersections by the NYSE is tantamount to a public nuisance. Having established the existence of a public nuisance, this court now turns its attention to whether plaintiff is entitled to injunctive relief.
At first blush it would appear that the plaintiff fails to meet one of the most essential requirements to warrant injunctive relief, the requirement of irreparable harm. While it is true that plaintiff has suffered a loss of business due to both the current construction {**3 Misc 3d at 1021}on William Street and the security checkpoints currently controlled by the NYSE, those damages, though perhaps difficult to calculate, are compensable in money and therefore not irreparable (Scotto v Mei, 219 AD2d 181, 184 [1st Dept 1996]; SportsChannel Am. Assoc. v National Hockey League, 186 AD2d 417 [1st Dept 1992]).
However, an analysis of cases involving the obstruction of public thoroughfares reveals that injunctive relief will lie notwithstanding that money damages are obviously calculable (Flynn v Taylor, 127 NY 596 [1891]; Callanan v Gilman, 107 NY 360 [1887]; Graceland Corp., 7 AD2d 89 [1958]; Broad Exch. Co., 117 Misc 82 [1921]; Bleichfeld v Friedenthal, 49 Misc 2d 584 [Sup Ct, Kings County 1966]). As the Appellate Division in Graceland explained, one who suffers damage or injury beyond that of the general inconvenience to the public at large, may recover for such nuisance in damages or obtain an injunction to prevent its continuance. This is old law. (Callanan v Gilman, 107 NY 360 [1887]; Prosser, Torts § 71, at 403 [2d ed]; 10 McQuillin, Municipal Corporations § 30.128 [3d ed]; 66 CJS, Nuisance § 78; Graceland, 7 AD2d 89, 91 [1958].)
Thus, the final inquiry, and perhaps the most difficult, is the consideration of the balancing of the equities. Plaintiff's business is proximate to a world-renowned landmark financial center. Following the 2001 terrorist attacks, it came as no surprise to anyone, including plaintiff, that security would be tightened in the area surrounding the NYSE (affidavit of Joseph Vassallo in support of preliminary injunction and temporary restraining order). In fact, the original secure zone as created by the NYPD initially included plaintiff's garage. Only after plaintiff approached defendant was the original security zone modified so as to lessen the burden on plaintiff's business. To that end, the NYPD and NYSE moved the security perimeter westward on Exchange Place, allowing plaintiff's patrons unfettered access to William Street until the city commenced construction at the intersection (affidavit of James C. Esposito, ¶¶ 14, 15, exhibit A).
Clearly, the city's closure of William Street coupled with the nuisance created by the NYSE security zone compounded plaintiff's economic losses, and clearly, plaintiff is entitled to recover on those losses. Nonetheless, defendant argues that even if the plaintiff has demonstrated a prima facie showing that defendant's maintenance of the subject road blockades constitutes a public nuisance, while plaintiff may be entitled to monetary {**3 Misc 3d at 1022}compensation, in balancing the economic losses of a private business against the security of several thousand people, an injunction, under these [*6]circumstances, cannot lie (Spring-Gar Community Civic Assn. v Homes for Homeless, 135 Misc 2d 689 [Sup Ct, Queens County 1987], revd on other grounds 149 AD2d 581 [2d Dept 1989]; Chatham Green v Bloomberg, 1 Misc 3d 434, 440 [Sup Ct, NY County 2003]).
However, plaintiff has presented, and the court perceives, a more complex and more troublesome issue, and that is the NYSE's "occupation" of a security zone that encompasses a substantial portion of lower Manhattan, without any authorization or supervision by a governmental body.
The parties in this matter concede that the original security zone established around the NYSE as it currently exists was created by the NYPD in direct response to the terrorist attacks on September 11, 2001. As previously indicated, the initial patrolling and monitoring of the security zone was conducted by a combination of NYPD officers, members of the NYPD Paid Detail Program, NYSE security, and outsourced security hired by the NYSE. At some point thereafter, and it is unclear as to when this happened, the control of the security posts at each of the blocked intersections was transferred to NYSE security.
There is no question that under New York law, the New York City Police Department has the authority to temporarily shut down public streets when it deems that there is a necessity for their closure, and that those closures may become permanent.[FN6]

However, this court questions whether the NYPD may delegate the maintenance and control of those blockades to a private security force without formally delegating some kind of police authority, or even if that authority may be delegated at all.
The NYSE has yet to provide this court with any evidence of an agreement giving them the authority to maintain the security perimeter and/or conduct the searches that their private security force conducts daily. As such, the NYSE's actions are unlawful{**3 Misc 3d at 1023}[FN7]

and may be enjoined as they violate plaintiff's civil rights as a private citizen.
The necessity for heightened security in today's world is apparent, and in this city, we are acutely aware of this need. As a result, it is often necessary for public and private entities to employ extraordinary measures, some of which are cumbersome and clearly overreaching, in an effort to ensure public safety. However, those steps must be taken in accordance with applicable law. The spectre of private police forces patrolling public streets is unacceptable, and private entities may not take the law into their own hands, no matter how well intentioned. As such, if the city is prepared to delegate the authority and responsibility of patrolling and searching the perimeter of the secure zone surrounding the New York Stock Exchange to the NYSE, it should do so in compliance with applicable law. Failing that, the NYSE must be enjoined from maintaining and patrolling the blockades at each of the subject intersections.
[*7]
Accordingly, it is ordered that the NYSE is preliminarily enjoined from maintaining the security blockades and conducting vehicle searches at the intersections of Wall Street and Broadway; Nassau Street and Pine Street; Wall Street and William Street; William Street and Exchange Place; Broad Street and Beaver Street; Beaver Street and New Street; and Broadway and Exchange Place.

Footnotes

Footnote 1: The NYPD Paid Detail Unit was created in the spring of 1998 to allow New York City police officers to perform off-duty uniformed security work. Officers hired under this program are not paid by taxpayer dollars; rather, they are privately paid by the entity hiring their services. Officers assigned to detail under this program have full law enforcement powers, and perform all police related duties (see NYPD Paid Detail Unit Web page <//www.ci.nyc.ny.us/html/nypd/html/misc/paid_detail.html>).

Footnote 2: Both the addition of vehicles at the blocked intersections as well as the concrete planters were added at the direction of the NYPD Police Commissioner (affidavit of James C. Esposito ¶ 12).

Footnote 3: The multiblock security zone created after September 11, 2001 was created by the NYPD and staffed by NYPD officers, NYSE security officers, NYPD paid detail officers, and NYSE contracted security teams (affidavit of James C. Esposito ¶ 11).

Footnote 4: Plaintiff's business was initially located within the no-vehicle security zone. However, in April 2002, the NYSE agreed and the NYPD approved moving the perimeter of the security zone further west on Exchange Place, so as not to prevent vehicles from using plaintiff's garage (affidavit of James C. Esposito, ¶ 15, exhibit A). In addition to this measure, the NYPD altered the traffic pattern by allowing cars to turn left onto Exchange Place from William Street so as to be able to avoid entering any part of the NYSE security zone.

Footnote 5: Each vehicle entering the NYSE secure zone is searched by NYSE security and bomb-sniffing canine teams.

Footnote 6: Although not a party to this action, Janet Siegel of the Corporation Counsel's Office represented to this court at oral argument that the NYSE barricade project, which presumably is intended to become permanent, had undergone an environmental review and the project was awaiting requisite permits from various agencies (transcript at 26).

Footnote 7: The court emphasizes that it is not of the opinion that the barricades themselves are unlawful, it is the operation of those barricades by a private security force that renders the practice unlawful.